SouthTrust Bank appeals from a judgment entered on a jury verdict in favor of Lisa Y. Donely. We affirm in part and reverse and render judgment in part.
 Facts[1] and Procedural History
This case involves five certificates of deposit ("CDs") issued by The Bank of Florala between June 1973 and June 1978. The CDs were made payable to "[Herman] Lurie as guardian for Mrs. [Jennie Lurie] Young." The Probate Court of Covington County had declared Young incompetent on September 15, 1970, and the following day issued letters of guardianship to Herman Lurie, her brother. Donely is Young's daughter. Through a series of mergers and name changes, SouthTrust acquired The Bank of Florala. The parties have stipulated that SouthTrust assumed The Bank of Florala's deposit liabilities.
On October 8, 1978, Young died, and on October 12, 1978, her will was admitted to probate. Donely was the only heir under Young's will. On December 14, 1978, seven CDs were delivered to the executor of Young's estate. During the administration *Page 936 
of the estate, one of the CDs was collected by the executor. On June 29, 1979, the executor delivered the six remaining CDs to Donely, who signed a document acknowledging her receipt of the CDs. On July 26, 1979, the estate was settled and closed.
Donely kept the six CDs locked in a filing cabinet at her home from June 29, 1979, the date she received them from the estate, until February 1999. During this time, one of the CDs disappeared.
Sometime around the first of March 1999, Donely sent the five remaining CDs to Lurie and asked him to cash them and to put the money in her savings account at SouthTrust. Lurie told Donely that SouthTrust had refused to cash the CDs; however, Lurie later testified that he did not want to get involved in the matter and that he never presented the CDs to SouthTrust for payment.
On October 20, 1999, Donely wrote Wallace Malone, then chief executive officer of SouthTrust, and demanded that SouthTrust redeem the CDs; Donely enclosed photocopies of the CDs with her letter. She explained in her letter that SouthTrust had told Lurie, and that Lurie had in turn informed her, that someone must have cashed the CDs in the 1970s. In response, on October 26, 1999, John D. Buchanan, then SouthTrust's chief legal officer, wrote Donely a letter indicating that SouthTrust was looking into the matter. On December 1, 1999, Donely wrote Buchanan another letter, stating that her husband had contacted someone with the customer assistance group at the office of the Comptroller of the Currency, who advised her husband that Donely should allow the bank 45 days to research a request for redemption before making an official complaint to the customer assistance group and seeking their intervention, and that she therefore expected a response by December 10. On December 10, 1999, John Stack, then the market chief executive officer of the Covington County Area of SouthTrust, wrote Donely and notified her that because SouthTrust had no record of the CDs being current liabilities of the Bank, SouthTrust would not be able to redeem the CDs. Donely made an official complaint to the customer assistance group, which confirmed the information in Stack's letter.
On March 13, 2001, Donely sued SouthTrust, alleging conversion, breach of contract, open account, and a violation of § 7-3-412, Ala. Code 1975.[2] On May 2, 2001, SouthTrust answered. On August 15, 2002, SouthTrust moved to amend its answer and on November 26, 2002, the trial court granted that motion. On January 13, 2003, SouthTrust moved for a summary judgment, which the trial court denied.
On April 9, 2003, Donely moved to amend her complaint to add a claim seeking the imposition of a constructive trust. SouthTrust opposed that motion. The trial court, on May 9, 2003, allowed Donely to amend her complaint, and SouthTrust answered the amended complaint on May 22, 2003.
On January 26-29, 2004, this case was tried before a jury. At the close of Donely's case-in-chief and again after the presentation of all of the evidence, SouthTrust moved for a judgment as a matter of law ("JML"). The trial court entered a JML in favor of SouthTrust on Donely's open-account claim and her claim that SouthTrust had violated Ala. Code 1975, § 7-3-412. The trial court instructed the jury on *Page 937 
the conversion and the breach-of-contract claims and on SouthTrust's affirmative defenses.[3] On January 29, 2004, the jury returned a verdict in favor of Donely on her claims of conversion and breach of contract and awarded damages in the amount of $176,090.20: $51,090.20[4] in compensatory damages on both the conversion and the breach-of-contract claims, $25,000 in damages for mental anguish, and $100,000 in punitive damages on the conversion claim.[5] The trial court entered a judgment on that verdict. On February 2, 2004, the trial court entered an order dismissing as moot Donely's claim seeking imposition of a constructive trust.
On March 1, 2004, SouthTrust moved for a JML or, in the alternative, a new trial. The trial court, after a hearing, denied SouthTrust's motions. SouthTrust appeals.
 Issues
SouthTrust argues that the trial court erred in (1) allowing Donely's conversion claim to go to the jury, and (2) entering a judgment on the jury's verdict awarding compensatory damages calculated by using compound interest.
 Standard of Review
In determining whether the trial court erred in denying a motion for a JML, this Court applies the same standard the trial court used initially in granting or denying the motion. See Exparte Alfa Mut. Fire Ins. Co., 742 So.2d 1237 (Ala. 1999).
 "Regarding questions of fact, the ultimate issue is whether the nonmovant has presented sufficient evidence to allow the case or issue to be submitted to the jury for a factual resolution. In an action filed after June 11, 1987, the nonmovant must present substantial evidence to withstand a motion for JML. A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. If the question is one of law, this Court indulges no presumption of correctness as to the trial court's ruling."
742 So.2d at 1240 (citations omitted).
"Additionally, this Court reviews the grant or denial of a motion for new trial under the standard set out in Alpine BayResorts, Inc. v. Wyatt, 539 So.2d 160, 162-63 (Ala. 1988):
 "`[W]hen the evidence meets the "sufficiency" test, jury verdicts are presumed correct, and this presumption is strengthened by the trial court's denial of a motion for a new trial. Therefore, a judgment based upon a jury verdict and sustained by the denial of a post-judgment motion for a new trial, will not be reversed on a weight-of-the-evidence ground unless it is "plainly and palpably" wrong.'"
Thompson Props. 119 AA 370, Ltd. v. Birmingham Hide TallowCo., 897 So.2d 248, 261 (Ala. 2004). *Page 938 
 Analysis
SouthTrust argues that "[a] certificate of deposit is a contract between the bank and its customer where the customer makes a general deposit with the bank and, in return, receives a certificate wherein the bank promises to repay the funds deposited at a particular interest rate and at a specified time." (SouthTrust's brief, p. 19.) Therefore, SouthTrust argues, a debtor-creditor relationship forms when a bank issues a certificate of deposit to a customer. See Montgomery v. Smith,226 Ala. 91, 145 So. 822 (1933). SouthTrust further argues that a certificate of deposit evidences a loan from the depositor to the bank, vesting title to the deposited money in the bank. Clark v.Young, 246 Ala. 529, 21 So.2d 331 (1945). Therefore, SouthTrust argues, "[a]n obligation to pay or a debt is ordinarily enforceable by assumpsit or a contract action, but such will not support an action for conversion." McCain v. P.A. PartnersLtd., 445 So.2d 271, 273 (Ala. 1984) (stating that plaintiff had no immediate property right in her payroll check at the time her employer withheld it because there had been no delivery). SouthTrust also cites Green Tree Acceptance, Inc. v. Tunstall,645 So.2d 1384, 1387 (Ala. 1994) ("a conversion will not lie when there is merely a relationship of debtor and creditor"), andKnox v. Moskins Stores, Inc., 241 Ala. 346, 348, 2 So.2d 449,450 (1941) (stating that there is no conversion when an employer allegedly erroneously assigns an employee's wages).
Finally, SouthTrust argues that, even if this Court finds that the conversion claim was properly submitted to the jury, Donely did not prove conversion. SouthTrust argues that in order for there to be a conversion, SouthTrust must have converted the actual CDs, not the funds deposited in the bank and represented by the CDs. SouthTrust argues that, in order for Donely to sustain her conversion claim, she must produce substantial evidence that she is entitled to "specific money capable of identification." See Covington v. Exxon Co., U.S.A.,551 So.2d 935, 938 (Ala. 1989). A SouthTrust branch administrator, Danny Bess, testified that when the CDs were issued, the money received by the bank was not segregated or placed in a special account but was commingled in a "kitty" or pool with all other deposits. Therefore, SouthTrust argues, Donely cannot prove her conversion claim because the funds she deposited were commingled with other funds and were not placed in a special account. See Green TreeAcceptance, Inc. v. Tunstall, 645 So.2d at 1387;[6]Johnson *Page 939 v. Life Ins. Co. of Alabama, 581 So.2d 438, 443 (Ala. 1991) (holding that the trial court correctly directed verdicts because "the insureds merely seek to recover a certain sum of currency paid for the purchase of insurance policies"); Covington,551 So.2d at 935 (stating that, even though each royalty-interest owner had its own account number, the moneys attributable to Exxon's royalty-owner accounts were located and commingled in numerous accounts worldwide and had never been segregated into a separate account; thus, the funds were not sufficiently identified to be converted).
In response, Donely argues that the primary inquiry in a conversion case is whether the money at issue was sufficiently segregated or identifiable. See Citizens Bank of Moulton v.Jones, 671 So.2d 737, 740 (Ala.Civ.App. 1995) (holding that "the $15,000 at issue is identifiable as the money from the loan that Citizens Bank made to Borden for the purchase of the property. Because the money at issue here comes from an identifiable source, i.e., the loan given to Borden to purchase the property from the Joneses, it is capable of being converted."). Further, Donely argues that each of the CDs at issue has its own separate account number, that each represents a stated face amount and interest rate, and that each is made payable to a specific person. Donely also argues that, even though her CDs are not "instruments" under Title 7 of Alabama's version of the Uniform Commercial Code because they are marked "nonnegotiable,"[7]
§ 7-3-420, Ala. Code 1975, recognizes that CDs may be converted.[8]
 "`To establish conversion, one must present proof of a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or a wrongful detention or interference with another's property. It is well settled that money may be subject to a conversion claim, where there is an obligation to keep that money intact or deliver it. Generally, an action for conversion of money will not lie unless the *Page 940 
money is specific and capable of identification.'"
Riscorp, Inc. v. Norman, 915 So.2d 1142, 1152 (Ala. 2005) (quoting Crown Life Ins. Co. v. Smith, 657 So.2d 821, 823 (Ala. 1994) (citations omitted; emphasis added in Riscorp)); seealso Bozeman v. Central Bank of the South, 646 So.2d 601, 603
(Ala. 1994); Covington v. Exxon Co., U.S.A., 551 So.2d 935, 938
(Ala. 1989); and Ott v. Fox, 362 So.2d 836, 839 (Ala. 1978).
"In other words, an action alleging conversion of money lies only where there is an obligation to deliver the specific pieces of the money in question or money that has been specifically sequestered, rather than a mere obligation to deliver a certain sum." Johnson, 581 So.2d at 443; see also Lewis v. Fowler,479 So.2d 725, 727 (Ala. 1985) ("When there is no obligation to return the identical money, but only a relationship of debtor or creditor, an action for conversion of funds representing the indebtedness will not lie against the debtor.").
 "The requirement that there be `earmarked money or specific money capable of identification' before there can be a conversion has been complicated as a result of the evolution of our economic system.
 "Now, in conversion cases, the courts are not confronted so much with a particular piece of money, i.e., a coin or a bill, but with identified or segregated sources from which money has come or types of accounts into which money has been deposited.
 ". . . Shares in a `Ready Assets Trust Account' which must be redeemed for cash and on which checks can be written have been held to be sufficiently identifiable to support an action in conversion."
Lewis, 479 So.2d at 726 (citations omitted).
Prosser and Keeton, in their discussion of what documents may support an action for conversion, state that because intangible rights could not be lost or found, "the original rule was that there could be no conversion of such property." W. Page Keeton et al., Prosser and Keeton on the Law of Torts, § 15, at 91 (5th ed. 1984). However, they state:
 "But this hoary limitation has been discarded to some extent by all of the courts. The first relaxation of the rule was with respect to the conversion of a document in which intangible rights were merged, so that the one became the symbol of the other — as in the case of a promissory note, a check, a bond, a bill of lading, or a stock certificate.[9]
This was then extended to include intangible rights to which a tangible object, converted by the defendant, was highly important — as in the case of a savings bank book, an insurance policy, a tax receipt, account books, or a receipted account. In all of these cases the conversion of the tangible thing was held to include conversion of the intangible rights, and to carry damages for it. The final step was to find conversion of the rights themselves where there was no accompanying conversion of anything tangible — as, for example, where a corporation *Page 941 
refuses to register a transfer of the rights of a shareholder on its books."
Keeton, § 15, at 91 (footnotes omitted).
In Knox v. Moskins Stores, supra, a case cited by SouthTrust, James Knox alleged that Moskin Stores had wrongfully placed with Knox's employer an assignment of Knox's wages. Based on the assignment, the employer withheld Knox's wages, and Knox alleged that Moskin Stores had converted Knox's wages. This Court held:
 "The term `account,' as here used, means a demand or claim, or right of action. It is a mere incorporeal right to a certain sum or to the collection of a debt. In this sense, it has no tangible entity, and will not support an action of trover. 1 Corpus Juris 596, § 1.1 C.J.S., Account, p. 571."
241 Ala. at 348, 2 So.2d at 450.
Alabama appellate courts recognize that ordinarily a creditor cannot sue a debtor alleging conversion, but they also recognize that a certificate of deposit itself may be converted. See,e.g., Bozeman v. Central Bank of the South, supra; Alabama CityBank of Gadsden v. Vaughn, 413 So.2d 1053 (Ala. 1982); Mann v.Bank of Tallassee, 694 So.2d 1375 (Ala.Civ.App. 1996); andStillwell v. Columbus Bank Trust, 675 So.2d 433 (Ala.Civ.App. 1995). In Bozeman, the Bozemans had executed a promissory note to Central Bank and had secured that debt with a certificate of deposit. This Court held that a jury could conclude that Central Bank converted the Bozeman's certificate of deposit when it cashed that certificate in order to pay off the loan the Bank believed was in default.
In Alabama City Bank of Gadsden v. Vaughn, Walter Vaughn agreed to put $15,000 into a certificate of deposit to be held by the bank as collateral on a promissory note. 413 So.2d at 1054. Evidence was presented indicating that the bank later cashed Vaughn's certificate of deposit. 413 So.2d at 1055. This Court affirmed the trial court's denial of the bank's motion for a directed verdict, holding that sufficient evidence was presented through Vaughn's testimony to afford a reasonable inference that the bank had converted Vaughn's money.
Similarly, in Mann v. Bank of Tallassee, Henry Mann and his wife, Judy Mann, had entered into a loan agreement with the bank to borrow money to buy a gravel-pit business. When the Manns defaulted on the loan, the bank retained the Manns' personal certificate of deposit. The Court of Civil Appeals held that the Manns had not presented substantial evidence indicating that they had title to, or that they had the right to the possession of, the certificate of deposit at the time of the alleged conversion; therefore, the trial court properly entered a summary judgment in favor of the bank on the Manns' conversion claim.
Finally, in Stillwell v. Columbus Bank Trust, Larry Stillwell and his mother, Mary Stillwell, opened two accounts in which they deposited Mary's life savings; one account was an interest-paying money-market account and the other account was a certificate of deposit. 675 So.2d at 433. Both accounts were opened in Larry's name only, but in order to make sure that Mary could access her money, Larry had a friend prepare a power of attorney for Mary as to both accounts. 675 So.2d at 433-34. When the certificate in the amount of $67,715.26 matured, Larry, with Mary's consent, took part of the money and invested it in a mutual fund and invested the remaining balance in another certificate of deposit. Mary cashed that second certificate, and Larry sued the bank, alleging breach of contract, conversion, negligence, and violation of a fiduciary relationship.675 So.2d at 433. This *Page 942 
Court held that, because the power of attorney, which did not include the number of the second certificate of deposit, did not allow Mary to cash the second certificate, the trial court properly denied the bank's motion for a summary judgment.675 So.2d at 434.
We agree with Donely that Bozeman, Vaughn, Mann, andStillwell stand for the proposition that a certificate of deposit is capable of being converted. However, in those cases, the actual certificate was held to have been converted, not simply the funds deposited in the bank to purchase the certificate or the amount due upon maturity of the certificate, that is, the amount originally deposited plus the stipulated interest. A certificate of deposit represents a contractual relationship between the issuer of the certificate and the purchaser of it. Failure of the issuer to make good on its contractual duty to pay is a breach of the contract. If, on the other hand, the certificate of deposit itself is wrongfully taken by another, the certificate has been converted. In this case, Donely alleges that when she presented her CDs to SouthTrust for payment, SouthTrust refused to disburse the funds to her. Thus, Donely has alleged that SouthTrust has failed to pay her a debt, and the proper action for that claim is a breach-of-contract action, not a conversion action.
Donely cites Crown Life Insurance Co. v. Smith, 657 So.2d 821
(Ala. 1994), in support of her argument that the funds represented by the CDs are capable of being converted. In CrownLife, an insurance agent stole the policyholder's premium refund checks and forged the policyholder's name on the checks. The Court stated: "While, according to Crown, the funds at issue were commingled with those of other Crown insureds, it is without question that the funds available under each policy were specifically identified by the policy number and could have been easily retrieved for the Smiths under the policy number."657 So.2d at 824. That is, the checks were instruments that reflected a debt of the insurance company to the insured. This Court held that the funds taken by the agent were "specific money capable of identification" and, therefore, were subject to a conversion claim. In this case, however, SouthTrust did not take the CDs from Donely, cash them, and then use those funds as did the insurance agent in Crown Life; SouthTrust refused to pay Donely the funds represented by the CDs when she attempted to redeem the CDs in her possession. Therefore, we hold that the trial court erred in submitting Donely's conversion claim to the jury.
SouthTrust also argues that the trial court erred in entering a judgment on the jury's compensatory-damages award. SouthTrust concedes that Donely's breach-of-contract claim was properly submitted to the jury, and it does not contest the jury's verdict in favor of Donely on that claim. However, SouthTrust argues that the calculation of the interest awarded to Donely was not in accordance with the terms of the CDs and that the jury should have awarded simple interest rather than compound interest. In support, SouthTrust argues that an award of compound interest must be made pursuant to a statute or agreement, either express or implied. Smith v. Yancey, 198 Ala. 221, 73 So. 477, 478
(1916). SouthTrust states that Donely was entitled to recover $12,000 for the principal face amount of the CDs and that the CDs provide:
 "Payment will be made to the registered payee for the above amount, plus unpaid interest upon maturity, and upon surrender of this certificate. Interest at the rate of ____ PERCENT per annum will be paid at the end of each _____ *Page 943 
months' period from date of issue by mailed remittance to payee."
SouthtTrust states that Donely's expert calculated the interest due on the CDs to be $39,090.20, but that the language of the CDs — "by mailed remittance to payee" — is a clear indication that the interest should not be compounded; SouthTrust does not further explain this argument. SouthTrust also argues that the CDs provide that the interest rate payable is "subject to change by the bank to comply with any change in the bank's regulations" and that the interest rates used to calculate the interest due in this case were contrary to the express terms of the CDs themselves. SouthTrust argues that its "Rules and Regulations Governing Deposit Accounts" provide that SouthTrust will determine the interest rate to be paid on its accounts. Finally, SouthTrust argues that, while compensatory damages do not have to be proven with mathematical certainty, Donely failed to present competent evidence of the amount of interest she was due on those damages. Donely argues that SouthTrust raises this issue for the first time on appeal and that, because SouthTrust did not object to her expert testimony at trial, it was properly admitted into evidence for the jury to consider. It is the plaintiff's burden to produce competent evidence establishing the existence of and amount of damages. Johnson v. Harrison, 404 So.2d 337 (Ala. 1981). With regard to the interest calculated in this case, Donely's expert, Michael Hawkins, a certified public accountant, testified as follows:
 "A. Basically, each of the certificates indicate the interest rate that's to be used. They also indicate whether or not they are compounded either semiannually or quarterly. If they are compounded semiannually, what that basically means is that if you invested, for instance, a thousand dollars, interest would be earned for six months. And then interest should be paid at that point in time. If interest were not paid, it would be added to the unpaid balance, and interest would accrue on the total balance from that point forward.
 "By the same token, if it's done quarterly, you would compound it quarterly from the standpoint of a thousand dollars with, say, 10 percent interest, it would be a hundred dollars per year. If you got twenty-five thousand dollars per quarter, after the fist [sic] quarter, if interest were not paid, you would have a thousand and twenty-five dollars. But interest would be then calculated on to the second period.
 "Q. Okay. So instead of just at the end of one year taking whatever interest is earned and putting it on top of it, that interest is added throughout the year depending on whether its quarterly or semi-annually?
"A. Unless the interest is paid directly to someone."
There is a presumption that a jury's verdict is correct; that presumption is strengthened when the trial court has denied a motion for a new trial. See First Alabama Bank of South Baldwinv. Prudential Life Ins. Co. of America, 619 So.2d 1313 (Ala. 1993). At trial, SouthTrust failed to present an alternative method of calculating the interest on the CDs and SouthTrust did not object to Hawkins's testimony; therefore, Hawkins's testimony was properly admitted as evidence for the jury to consider.
 Conclusion
The trial court erred in denying SouthTrust's motions for a JML as to the conversion claim, in submitting the conversion claim to the jury, and in denying SouthTrust's postjudgment motion for a JML as to that claim. We, therefore, reverse the *Page 944 
judgment as to the conversion claim and render a judgment in favor of SouthTrust on that claim. We affirm the judgment as to the breach-of-contract claim, including the amount of the compensatory damages awarded to Donely on that claim.
AFFIRMED IN PART AND REVERSED AND JUDGMENT RENDERED IN PART.
NABERS, C.J., and HARWOOD, STUART, and BOLIN, JJ., concur.
[1] For the most part, the facts in this case are not in dispute; Donely, the appellee and the plaintiff below, adopts in her brief SouthTrust's statement of the facts.
[2] Section 7-3-412, Ala. Code 1975, is entitled "Obligation of issuer of note or cashier's check."
[3] SouthTrust asserted the following affirmative defenses: (1) statute of limitations; (2) laches; and (3) discharge and payment.
[4] Donely's expert had testified that interest in the amount of $39,090.20 was due on the CDs, which had a value of $12,000.
[5] On appeal, SouthTrust does not challenge the amount of the punitive-damages award or the damages awarded for mental anguish.
[6] In Green Tree, Louis Tunstall borrowed $14,701.20 from Green Tree to finance his purchase of a mobile home from Don Graves, Inc. 645 So.2d at 1385. Green Tree assigned a number to that loan, but it did not set aside funds to an account with that loan number. 645 So.2d at 1386. Instead, the funds were commingled with other money held by Green Tree. Id. As part of the loan, Tunstall received a $1,200 allowance for an air conditioner and a heat pump. Green Tree executed a check for $1,200 to Graves; the check included Tunstall's loan number and the notation "A/C Holdback," and Green Tree placed the check in a file. 645 So.2d at 1385. Green Tree never delivered the check to Graves and never deposited any money in an account to pay it. Graves went out of business without first installing a heating and air conditioning system in Tunstall's mobile home. Tunstall sued Graves and the manufacturer of the mobile home, and he later amended his complaint to add claims against Green Tree.645 So.2d at 1385. Among other claims, Tunstall alleged that "Green Tree `converted to its own use that specific sum of money which it had received for the sole and express purpose' of purchasing and installing a heating and air conditioning unit for his mobile home." 645 So.2d at 1386. Green Tree presented evidence indicating that it maintains a "zero balance cash management account" to make payments to mobile-home dealers such as Graves and that it borrows money daily against its line of credit to pay the checks presented to it. 645 So.2d at 1385-86. Noting that Green Tree did not set aside funds to be deposited to an account with Tunstall's loan number and that the funds in Tunstall's account were commingled with other funds, this Court concluded that the trial court erred in denying Green Tree's motions for a directed verdict and for a judgment notwithstanding the verdict on the conversion claim.
[7] Section 7-3-104(d), Ala. Code 1975, states:
 "A promise or order other than a check is not an instrument if, at the time it is issued or first comes into possession of a holder, it contains a conspicuous statement, however expressed, to the effect that the promise or order is not negotiable or is not an instrument governed by this article." Under § 7-3-104(b), Ala. Code 1975, an "`[i]nstrument' means a negotiable instrument."
A "certificate of deposit" is defined in § 7-3-104(j), Ala. Code 1975, as "an instrument containing an acknowledgment by a bank that a sum of money has been received by the bank and a promise by the bank to repay the sum of money. A certificate of deposit is a note of the bank."
[8] Section 7-3-420(a) provides:
 "An instrument is converted under circumstances which would constitute conversion under personal property law. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment."
In response on Donely's argument that § 7-3-420(a) should apply in this case even though the CDs are nonnegotiable and, therefore, not "instruments," SouthTrust argues that § 7-3-420(a) has no application to this case because, it says, the statute primarily deals with the payment of checks in the check-collection system and with conversion of the instrument itself, not the conversion of the funds on deposit.
[9] A negotiable instrument is a chose in action that is subject to conversion. See First Nat'l Bank of Montgomery v.Montgomery Cotton Mfg. Co., 211 Ala. 551, 552, 101 So. 186, 188
(1924) (noting that "`bills of exchange, promissory notes, and other forms of negotiable instruments or commercial paper'" are "`choses in action represented by written instruments or something capable of seizure and possession'" (quoting 30 Cyc. p. 2012D) and that "`[t]he measure of damages is prima facie the value [of the instrument] on its face'" (quoting McPeters v.Phillips, 46 Ala. 496, 497 (1871))).