Elisa Simmons Pinigis, as executrix of the estate of Doris Porter Coyle, deceased, challenges the summary judgments in favor of Regions Bank ("the Bank") in her action against the Bank for its payment of unauthorized checks drawn on Coyle's account and for its alleged conversion of certificates of deposit. We affirm in part, reverse in part, and remand.
 I. Factual Background
On September 19, 2003, Pinigis sued the Bank. The complaint contained the following pertinent allegations:
 "5. In 1993, Doris Porter Coyle opened a checking account . . . with [the Bank]. The signature card signed by Coyle when the account was opened clearly indicated that she was the only *Page 843 
person authorized to draw funds on this account. Coyle also established a number of certificate[s] of deposit with [the Bank], of which she was the sole owner.
 "6. In late 1997, Coyle suffered a debilitating illness after which she was in a coma for approximately three weeks. Coyle was hospitalized and required extensive care as a result of the illness. Coyle was then age 90. Coyle's health was severely affected as a result of the illness for the last years of her life.
 "7. At the time of her illness, Coyle's income was approximately $1,000.00 per month, deriving from two pensions and Social Security benefits.
 "8. Shortly after Coyle's illness, [Walter Massey and his wife, Laquana Massey,] began involving themselves in Coyle's affairs. By promoting themselves as business owners, bookkeepers and family, the Masseys impermissibly and fraudulently gained Coyle's confidence and exercised undue influence over her.
 "9. After the Masseys became involved with Coyle, the expenditures from Coyle's account with [the Bank] increased substantially. By January 1999 and perhaps earlier, the Masseys began writing checks out of Coyle's account with [the Bank] and forging Coyle's name to the signature line. From mid-1999 until Coyle's death on January 1, 2003, the withdrawals from Coyle's . . . account noticeably and uncharacteristically increased, so that in excess of $257,000.00 worth of checks were written out of Coyle's checking account during that period of time. These unusual expenditures included large amounts for food even though Mrs. Coyle's diet was primarily made up of liquid supplements. The expenditures also included numerous checks for large individual amounts to Wal-Mart [discount department store], electronic gaming stores, sporting goods stores, gourmet markets, liquor stores, restaurants, fast food, Harley Davidson motorcycle shops, academic tutoring, acne medication, and lingerie, to name only a few. Further, the Masseys used Coyle's funds to pay their MasterCard and Home Depot charge accounts. In 2002 alone, $16,700.00 was paid from Coyle's . . . account to the Masseys' personal Sears MasterCard charge account. The Masseys also paid their utilities and their son's truck insurance from Coyle's account. Payments were also made from the Regions account to a McRae's/ Saks credit card for purchases of jewelry, watches and menswear by and for the benefit of the Masseys. [The Bank] participated with the Masseys and honored those payments from Coyle's account. The vast majority, if not all, of these expenditures were for the Masseys' personal benefit.
 ". . . .
 "11. Due to the increased spending by the Masseys on Coyle's account, Coyle's account became overdrawn. Prior to the pattern of noticeable and uncharacteristic withdrawals beginning in the middle of 1999, Coyle had never overdrawn her checking account. After 1999, [the Bank] allowed the overdrafts and benefited from the overdraft fees charged to Mrs. Coyle. . . . [The Bank] participated with the Masseys in cashing a number of Coyle's certificate[s] of deposit in Coyle's absence and without Coyle's permission, which resulted in substantial early withdrawal penalties paid to [the Bank], and enabled [the Bank] to offer lower yields and interest rates on the remaining certificates of deposit. *Page 844 
 "12. [The Bank] did nothing to question these increased expenditures, over-drafts, suspicious activity on the accounts, premature cashing of certificates of deposit, nor took any other steps to protect Coyle's account. Further, [the Bank] allowed the Masseys to substantially deplete Coyle's account of all available funds and further misappropriate the balance of her investment and certificates of deposit .
 ". . . .
 "14. On January 1, 2003, Mrs. Coyle died at the age of 95. Pinigis was appointed executrix of Coyle's estate.
 "15. Although [the Bank] was notified of Mrs. Coyle's death as early as January 2, 2003, a number of checks written by the Masseys on Coyle's account were processed after Coyle's death, and after [the Bank] had notification of her death."
(Emphasis added.) Pinigis sought to recover funds the Bank had "improperly charged Coyle's account [for the allegedly forged checks], in violation of [the Alabama Uniform Commercial Code — Bank Deposits and Collections, Ala. Code 1975, § 7-4-401 and -405]." Pinigis also alleged that the Bank converted two certificates of deposit, which Pinigis attempted to redeem after Coyle's death as property of the estate, and sought compensatory and punitive damages under a conversion claim.
The Bank answered the complaint on November 4, 2003. The answer stated, in pertinent part: "The plaintiffs claims are barred by the applicable statutes of limitations,
including but not limited to the provisions of UCC Articles 3 and 4." (Emphasis added.)
Subsequently, the Bank moved for a summary judgment directed chiefly to the claim asserting that the Bank had paid unauthorized checks. In that motion, the Bank argued that "Pinigis's claim that Regions Bank is liable for paying unauthorized [checks] is absolutely barred by the statute ofrepose stated in the Alabama Commercial Code." (Emphasis added.) More specifically, the Bank insisted that Pinigis had never "identified a particular check that was unauthorized," and, consequently, that "[u]nder the authority of section7-4-406(f) of the [Alabama Commercial] Code, Pinigis's claims that [the Bank] improperly paid checks containing Ms. Coyle's forged signature or that it paid checks not authorized by Ms. Coyle are absolutely barred." (Emphasis added.)
In her response to that motion, Pinigis objected to the Bank's reliance on § 7-4-406(f). She argued that "[a] statute of repose, such as § 7-4-406(f), is an [affirmative defense]," which the Bank was required to include in its answer, or it was waived. The Bank "did not plead the statute of repose" in its answer, Pinigis insisted, and, therefore, could not "avail itself of the affirmative defense for the first time in its motion for summary judgment."
On May 2, 2005, the trial court entered a partial summary judgment in favor of the Bank. The court stated that the Bank "was not given any specific notification of the unauthorized signatures on checks until the instant lawsuit was filed . . . almost nine months after the last unauthorized check was written." The court concluded that, under § 7-4-406(f), Pinigis could not "hold the [B]ank liable for checks paid by the [B]ank more than 180 days prior to discovery and reporting." The judgment left pending Pinigis's claim alleging conversion of the certificates of deposit.
Pinigis filed a motion to vacate the partial summary judgment. The Bank filed a second summary judgment motion directed to Pinigis's conversion claim. On August 3, 2005, the trial court entered a final *Page 845 
summary judgment for the Bank on the conversion claim, and Pinigis appealed.
On appeal, Pinigis first contends that the trial court erred in relying on § 7-4-406(f) to bar her claims alleging the wrongful payment of forged checks. Next, she insists that the "trial court erroneously concluded that under Alabama law a certificate of deposit cannot be the subject of a conversion claim." Pinigis's brief, at 52.
 II. Section 7-4-406(f)
The partial summary judgment for the Bank on Pinigis's payment-of-unauthorized checks claim was based on §7-4-406(f); the trial court concluded that Pinigis had defaulted on her statutory "duty to discover and report [an alleged] unauthorized signature or alteration." Section 7-4-406 provides:
 "(a) A bank that sends or makes available to a customer a statement of account showing payment of items for the account shall either return or make available to the customer the items paid or provide information in the statement of account sufficient to allow the customer reasonably to identify the items paid. The statement of account provides sufficient information if the item is described by item number, amount, and date of payment.
 "(b) If the items are not returned to the customer, the person retaining the items shall either retain the items or, if the items are destroyed, maintain the capacity to furnish legible copies of the items until the expiration of seven years after receipt of the items. A customer may request an item from the bank that paid the item, and that bank must provide in a reasonable time either the item or, if the item has been destroyed or is not otherwise obtainable, a legible copy of the item.
 "(c) If a bank sends or makes available a statement of account or items pursuant to subsection (a), the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.
 "(d) If the bank proves that the customer failed, with respect to an item, to comply with the duties imposed on the customer by subsection (c), the customer is precluded from asserting against the bank:
 "(1) The customer's unauthorized signature or any alteration on the item, if the bank also proves that it suffered a loss by reason of the failure; and
 "(2) The customer's unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding 30 days, in which to examine the item or statement of account and notify the bank.
 "(e) If subsection (d) applies and the customer proves that the bank failed to exercise ordinary care in paying the item and that the failure substantially contributed to loss, the loss is allocated between the customer precluded and the bank asserting the preclusion according to the extent to which the failure of the customer to comply with subsection (c) and the failure of the bank to exercise *Page 846 
ordinary care contributed to the loss. If the customer proves that the bank did not pay the item in good faith, the preclusion under subsection (d) does not apply.
 "(f) Without regard to care or lack of care of either the customer or the bank, a customer who does not within 180 days after the statement and the items or a legible copy or image of the items are sent to the customer, or within one year after the statement or items are otherwise made available to the customer (subsection (a)) discover and report the customer's unauthorized signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration.
Without regard to care or lack of care of either the customer or the bank, a customer who does not within one year after the statement or items are sent or made available to the customer, discover and report any alteration on the back of the item or any unauthorized endorsement is precluded from asserting against the bank any such alteration or unauthorized endorsement. If there is a preclusion under this subsection, the payor bank may not recover for breach of warranty under Section 7-4-208 with respect to the unauthorized signature or alteration to which the preclusion applies."
(Emphasis added.)
Pinigis argues that the trial court's consideration of § 7-4-406(f) to bar her claim is precluded by Ala. R. Civ. P. 8(c), which provides, in pertinent part:
 "In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory-negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense."
(Emphasis added.) Pinigis contends that the limitations period in § 7-4-406(f) is an affirmative defense that the Bank failed to plead as required by Rule 8(c). She concedes that the Bank's answer included a reference to "the applicable statutes of limitations, including but not limited to the provisions of UCC Articles 3 and 4," but she argues that this reference provided insufficient notice of the Bank's purported reliance on § 7-4-406(f) as an affirmative defense. This is so, because, she insists, § 7-4-406(f) is not a statute of limitations, but is, in fact, a statute ofrepose.
Regarding affirmative defenses, this Court has said:
 "Once an answer is filed, if an affirmative defense is not pleaded, it is waived. Robinson v. [Morse], 352 So.2d 1355, 1357 (Ala. 1977). The defense may be revived if the adverse party offers no objection (Bechtel v. Crown [Central] Petroleum Corp., 451 So.2d 793, 796 (Ala. 1984)); or if the party who should have pleaded it is allowed to amend his pleading (Piersol v. ITT [Phillips] Drill Division, Inc., 445 So.2d 559, 561 (Ala. 1984)); or if the defense appears on the face of the complaint (cf., Sims v. Lewis, 374 So.2d 298, 302
(Ala. 1979); and Williams v. McMillan, 352 So.2d 1347, 1349 (Ala. 1977)). See, also, 2A J. Moore, Federal Practice § 8.273 at 8-251 (3d ed. 1984). But, specifically, a defendant `cannot revive [the waived affirmative defense] in a memorandum in support of a motion for summary judgment' Funding Systems Leasing Corp. v. Pugh, 530 F.2d 91, 96 (5th Cir.1976)." *Page 847 
Wallace v. Alabama Ass'n of Classified SchoolEmployees, 463 So.2d 135, 136-37 (Ala. 1984) (emphasis added).
The Bank implicitly concedes that the affirmative defense of § 7-4-406(f) is waivable; that is, the Bank does not argue that the subsection is not an affirmative defense encompassed within the rules stated in Wallace.[1] The Bank also implicitly concedes that § 7-4-406(f) is not a statute of limitations. In that connection, it says: "[The] Bank did not fail to plead its affirmative defense. The most that could be said is that [it] did not use a specific term of art, that is, it used the phrase `statutes of limitation' as opposed to `statute of repose.'" Bank's brief, at 35. If its answer is " `liberally construed,'" the Bank argues, the pleading "more than sufficiently gives notice that [it] intended to rely on section 7-4-406(f)." Bank's brief, at 35-36 (quoting Adkison v.Thompson, 650 So.2d 859, 862 (Ala. 1994) ("Under modern rules of civil procedure, pleadings are to be liberally construed in favor of the pleader; the primary purpose of pleading is to give fair notice to adverse parties of a claim against them.")). However, the Bank's defense cannot be saved by liberal construction.
The Bank correctly concedes that § 7-4-406(f) is not a statute of limitations. That proposition is definitively stated in the Alabama Comment to § 7-4-406:
 "The notice requirements in subsection (f) are the periods within which the customer must notify the drawee bank of the fraud or be absolutely barred from recovery. These notice requirements are in the nature of a statute of repose for reporting unauthorized signatures or alterations rather than a measure of time within which a suit to re-credit the account must be brought (a statute of limitations). A statute of limitations is now established under revised Section [4-111].
 "Under present Alabama law customers must discover and report forgeries or alterations within 180 days and forged indorsements within one year from the time the statement and items are made available to the customer."
(Emphasis added.)
Courts and commentators agree that the time limitation of § 7-4-406(f), also found in the codes of various other states, the Uniform Commercial Code, and corresponding predecessor sections, constitutes a "statute of repose," Brian Patrick Perryman, Note, Checking Checks: American Airlines Employees Federal Credit Union v. Martin and theAmenability of Common Law Waiver to Deposit Agreement Cut-downProvisions, 10 Geo. Mason L.Rev. 551, 594 n. 84 (2002); a "statutory prerequisite of notice," Euro Motors, Inc. v.Southwest Fin. Bank Trust Co., 297 Ill.App.3d 246,252, 696 N.E.2d 711, 715, 231 Ill.Dec. 415, 419 (1998) (citing cases); or a statutory "non-claim provision," Barkley Clark,The Law of Bank Deposits, Collections and Credit Cards
K 6.23d, at S6-22 n. 62.2 (Supp. 1987), rather than a statute of limitations. See also SpanCom Servs., Inc. v. SouthTrustBank, N.A., 744 So.2d 931, 932 (Ala.Civ.App. 1999) ("§7-4-406(f), which is in the nature of a statute of repose, absolutely bars recovery . . . regardless of negligence").
"A true statute of limitations prescribes a time period within which an action must be brought upon claims or rights to be enforced, and should be distinguished from nonclaim statutes, jurisdictional limitation periods, and statutes of *Page 848 
repose." 51 Am.Jur.2d Limitation of Actions § 7 (2000) (footnotes omitted). "Statutes of nonclaim and statutes of limitations `are separate and distinct, and embrace scopes of policy not commensurate, but, in many particulars, essentially diverse.'" Chumney v. Houston County, 632 So.2d 1328,1329 (Ala. 1994) (quoting Ivory v. Fitzpatrick,445 So.2d 262, 264 (Ala. 1984)). "`The whole theory of [a non-claim] statute is to create a defense broader in its operation thanthe statute of limitations, not only barring remedies, but extinguishing debts and liabilities.'" Ivory,445 So.2d at 264 (quoting Fretwell v. McLemore, 52 Ala.124, 144 (1875) (emphasis in Ivory)).
The 180-day notice period in § 7-4-406(f) "is not a statute of limitations, but a statutory prerequisite to suit."Euro Motors, Inc., 297 Ill.App.3d at 254,696 N.E.2d at 716, 231 Ill.Dec. at 420. "[I]t does not give a customer [180 days] to bring suit. Rather, it simply requires the customer to notify the bank of an unauthorized signature or alteration within [180 days] in order to preserve the right to bring suit." Id. See also 6B William D. Hawkland 
Lary Lawrence, Uniform Commercial Code Series § [Rev] 4-406:08 (Supp. 1994) ("Section 4-406(f) is not a statute of limitations. As long as notice is given within the designated time period, the customer may commence his action any time within the applicable statute of limitations period.").
By contrast, the actual statute of limitations for a violation of article 4 of Alabama's version of the Uniform Commercial Code is three years from the accrual of the cause of action. Section 7-4-111. Because of these distinctions, the Bank's answer, which raised only a statute-of-limitations defense, did not constitute sufficient compliance with Rule 8(c) insofar as the statute of repose of § 7-4-406(f) is concerned.
Although the Bank chiefly argues that it sufficiently pleaded § 7-4-406(f), it relies, in the alternative, on an exception to the pleading requirement stated inWallace, supra, namely, that an affirmative defense is preserved if it "appears on the face of the complaint."Wallace, 463 So.2d at 137. The Bank's reliance on this exception, however, is misplaced.
This is so, because the bar of § 7-4-406(f) does not appear on the face of Pinigis's complaint. Application of the statutory bar turns on the absence of notice, not on the date of commencement of suit. Section 7-4-406(f) simply bars a credit for any check containing an "unauthorized signature or alteration" that is not reported to the Bank "within 180 days after the statement and the items . . . are sent to the customer." Section 7-4-406(f). However, the complaint does not demonstrate whether — or when — notice was given as to any check. Moreover, paragraph 15 of the complaint avers that the Bank paid a number of checks after it was notified of Coyle's death. The complaint does not demonstrate when these checks were paid, or if they were paid within 180 days of notice of "unauthorized signature[s] or alteration[s]."
In short, the Bank failed to plead § 7-4-406(f). Based on the arguments presented, we conclude that the trial court erred in applying the bar of § 7-4-406(f) to Pinigis's claim. The summary judgment for the Bank on Pinigis's claim that the Bank had paid unauthorized checks is, therefore, reversed, and the cause is remanded for further proceedings.
 III. Conversion
Pinigis contends that the trial court erred in concluding that Pinigis could "not state a common-law claim of conversion in this instance" and granting the Bank's second *Page 849 
summary-judgment motion. She concedes that review of her conversion claim does not require a factual analysis, but, instead, involves "only [a] discrete issue of law." Pinigis's brief, at 52 n. 18. Therefore, we review it de novo.Pritchett v. ICN Med. Alliance, Inc., 938 So.2d 933
(Ala. 2006); Alabama State Bar v. Caffey, 938 So.2d 942
(Ala. 2006).
The undisputed facts underlying this claim were succinctly stated in the trial court's final judgment:
 "At the time of her death, Ms. Coyle had on deposit with the Bank sums represented by Certificate of Deposit number 01____[for approximately $100,000] and Time Deposit number 48____[for approximately $10,000].
 "2. Following Ms. Coyle's death, [Pinigis] sought to redeem these deposits, but could not locate the original Certificate of Deposit number 01____. The Bank's copy of the face of the Certificate of Deposit states as follows: `This certifies that this sum has been deposited with this bank and is subject to withdrawal at maturity with interest upon surrender of this certificate properly endorsed by [Doris Porter Coyle].'
 "3. Because the whereabouts of the certificate [was] unknown, [Pinigis] could not surrender the certificate as required on the face of the deposit agreement, [and] the Bank requested that [she] execute an indemnity agreement and purchase an indemnity bond from a licensed insurer before the Bank would redeem the lost certificate. The Time Deposit, in contrast, was a newer account which did not require any certificate to be presented.
 "4. [Pinigis] did not want to give a bond because it `seemed like an unfair requirement.' [Pinigis's] last written correspondence with the Bank on the issue is dated September 18, 2003, after which she `decided to let [her] lawyers deal with the whole issue.' Given the complication of the indemnity requirement, [Pinigis] decided it was prudent to leave the smaller Time Deposit alone for the time being.
 ". . . .
 "5. Although [Pinigis] never found the lost certificate, nor purchased an indemnity bond, on April 17, 2005, following the filing of this action, the Bank voluntarily [paid] the full proceeds of Certificate of Deposit number 01____, plus interest, to [Pinigis]. The Bank also paid [Pinigis] Time Deposit number 48____ in full, plus interest."
(Citations to the record omitted; emphasis deleted.)
The trial court concluded — and we agree — that Pinigis's conversion claim is controlled by SouthTrustBank v. Donely, 925 So.2d 934 (Ala. 2005). That case involved a dispute between Lisa Donely and SouthTrust Bank over five certificates of deposit ("the CDs") owned by Donely and payable by SouthTrust. Donely sued SouthTrust, alleging conversion and breach of contract after she presented the CDs for payment and SouthTrust refused to disburse the funds.925 So.2d at 937. The trial court denied SouthTrust's motion for a judgment as a matter of law ("JML") and submitted both claims to the jury, which returned a verdict in favor of Donely.925 So.2d at 938.
On appeal, SouthTrust challenged the denial of its JML motion only as to the conversion claim. As to that claim, this Court reversed the judgment of the trial court. We held that a bank's refusal to redeem a CD upon presentment of the certificate by the owner does not give rise to a conversion claim.
In so doing, we distinguished Bozeman v. Central Bank ofthe South, *Page 850 646 So.2d 601 (Ala. 1994); Alabama City Bank of Gadsden v.Vaughn, 413 So.2d 1053 (Ala. 1982); Mann v. Bank ofTallassee, 694 So.2d 1375 (Ala.Civ.App. 1996); andStillwell v. Columbus Bank Trust, 675 So.2d 433
(Ala.Civ.App. 1995). We noted that, "in those cases, theactual certificate was held to have been converted,not simply the funds deposited in the bank to purchase thecertificate or the amount due upon maturity of the certificate, that is, the amount originally deposited plus the stipulated interest." Donely, 925 So.2d at 942
(emphasis added). We explained:
 "A certificate of deposit represents a contractual relationship between the issuer of the certificate and the purchaser of it. Failure of the issuer to make good on its contractual duty to pay is a breach of the contract. If, on the other hand, the certificate of deposit itself is wrongfully taken by another, the certificate has been converted. In this case, Donely alleges that when she presented her CDs to SouthTrust for payment, South-Trust refused to disburse the funds to her. Thus, Donely has alleged that South-Trust has failed to pay her a debt, and the proper action for that claim is a breach-of-contract action, not a conversion action.
 ". . . SouthTrust [merely] refused to pay Donely the funds represented by the CDs when she attempted to redeem the CDs in her possession. Therefore, . . . the trial court erred in submitting Donely's conversion claim to the jury."
925 So.2d at 942 (emphasis added).
Pinigis contends that Donely was wrongly decided and/or that it is distinguishable from her case. We disagree that Donely was wrongly decided; we see no meaningful distinction between it and this case. This case, likeDonely, does not involve an allegation that the "certificate of deposit itself [was] wrongfully taken."Id. In both cases, the bank merely refused to pay the "funds represented by the CDs" when requested to do so by the payee. Id. The undisputed facts of this case fail, therefore, to establish a claim of conversion, and the trial court properly entered a summary judgment for the Bank on the conversion claim.
 IV. Conclusion
In summary, the trial court erred in entering a summary judgment for the Bank on Pinigis's claim of unauthorized payment of checks. Thus, the partial summary judgment in favor of the Bank is reversed, and the cause is remanded for further proceedings. The trial court did not err, however, in entering a summary judgment for the Bank on Pinigis's conversion claim. That summary judgment is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
NABERS, C.J., and LYONS, BOLIN, and PARKER, JJ., concur.
SMITH, J., recuses herself.
[1] Therefore, for the purposes of this opinion, we will treat § 7-4-406(f) as an affirmative defense subject to waiver if not properly pleaded.