These related appeals arise from the refusal of Prudential Life Insurance Company of America ("Prudential") to pay certain life insurance benefits to Carole B. Tindal. They are presently before this Court for the second time; for a complete history of the cases, see Badners v. Prudential Life Insurance Co.,567 So.2d 1242 (Ala. 1990).
 I. (PRUDENTIAL v. TINDAL) (Appeal) (TINDAL v. PRUDENTIAL) (Cross-Appeal)
Tindal, the former wife of the deceased policy holder (Thomas Badners), sued Prudential and First Alabama Bank of South Baldwin ("FAB"), alleging a breach of contract. At the end of the trial, the trial court charged the jury that it could return a verdict against either Prudential or FAB, but not against both defendants. The jury returned a verdict for Tindal and against Prudential and awarded $38,246.46[1] in damages.
Prudential appeals, contending that the jury's verdict is against the great weight of the evidence. Prudential also argues that the trial court erred by admitting the testimony of Donna Badners regarding a conversation with John Grant, an agent of Prudential.
On January 4, 1974, Prudential issued a life insurance policy naming Thomas Badners as insured and his wife Carole Badners as beneficiary. (Thomas and Carole Badners later divorced; Carole remarried and is now known as Carole B. Tindal.) The face amount of the policy was $6,000, with a decreasing term rider in the sum of $30,000. The policy specified that the premium due dates were at intervals of one month after the policy issue date, January 4, 1974. The policy further stated that if any premium was not paid when due, it would be in default. The policy allowed a grace period of 31 days for the payment of a premium that was in default. During the grace period, the policy would continue in force, and if the insured died within this grace period, any premium in default would be deducted from the payment to the beneficiary. However, if a premium remained unpaid at the end of the grace period, the policy would terminate and would be of no value except as might be provided by the nonforfeiture provision.
Tindal testified that when the policy was purchased from Prudential, the agent told her and Mr. Badners that the monthly premiums would be a "little bit cheaper" if they chose to make their payments by draft. Therefore, by agreement between Mr. Badners and FAB, the monthly premium ($28.62) was to be paid by a "Pru-matic" draft drawn each month on the account of Mr. Badners (account number 21-076-50). The premium due date specified by the policy was the 4th of each month; however the checks printed by Prudential were dated as of the 7th of each month.
Tindal testified that before her divorce from Mr. Badners in 1984, she regularly balanced the family checking account, and, according to her recollection, the checks were processed for payment on different dates each month. She stated that on a few occasions the premium check missed the bank statement cutoff date (which she recalled was around the 18th), and that on such occasions two checks would be paid during the next statement period. Tindal further testified that a premium check "bounced" on one occasion and that the draft was returned to Prudential because of insufficient funds in the account. However, *Page 1316 
she testified that Prudential wrote her a letter advising her of what had happened. Tindal stated that she then sent in the payment and that Prudential reinstated the policy right away.
In March 1984, Mr. Badners and Carole were divorced. Mr. Badners closed his checking account (21-076-50) and opened a new account. Thereafter, when Prudential would send the draft on the closed account, FAB would manually change the account number of the draft to the number of a funded account (either Mr. Badners's personal account or his business account). This was all done with the knowledge of Mr. Badners. Eventually, Mr. Badners requested that the draft be deducted from his personal account. However, he never formally changed his account number with Prudential on the "Pru-matic" draft.
This procedure continued for over 25 months, until June 1986. On June 12, 1986, FAB did not pay the premium draft but returned it to Prudential. An employee of FAB testified that she could not explain why the rejection of the draft by the computer was not manually overridden, as had been done for the past 25 months.
The statement closing date for both of Mr. Badners's active checking accounts with FAB was June 17, 1986. Mr. Badners did receive the statements issued on that date, but they were not opened until after Mr. Badners's death.
Thomas Badners died on July 18, 1986. About two weeks later, Donna Badners (widow of Mr. Badners)[2] was contacted by John Grant, an agent of Prudential. It is undisputed that this was beyond the 31-day grace period set out in the policy. Mr. Grant advised Mrs. Badners that he needed to come by and talk about the June premium. When they met, Mrs. Badners testified that when he told her the June payment had not been paid, she asked Grant if she needed to pay the premium. She stated that he first said "yes," but that when she started to write a check, he told her not to pay "because the insurance company had messed up, and they would just total it out when they made the payoff." She testified that the agent referred to some kind of a problem about a change in Prudential's method of billing.
Mrs. Badners testified that she heard nothing further from John Grant, but that she did receive an envelope from Prudential postmarked August 14, 1986. Inside was a coupon book for the monthly premiums. It had a coupon for the June 4, 1986, premium payment, which stated "Please make your check or other order for payment payable to [Prudential]." She testified that the amount of the premium on the coupon was $29.28, which reflected a slight increase due to the method of payment. (As noted above, when the policy was originally purchased, Mr. Badners had chosen to pay by "Pru-matic" draft because the premium would be slightly lower.)
Before the June premium payment was dishonored, Mr. Badners had requested information from Prudential concerning changing his account number on the "Pru-matic draft." Prudential's files show two separate documents showing this request, along with a notation that Mr. Badners wished to change his checking account number on the draft.
After Mr. Badners's death, Tindal claimed benefits under the policy and, instead of receiving approximately $36,000 due under the policy, she received a reduced payment of $8,092.75. Tindal stated that because this was far less that she had expected, she telephoned Prudential to find out why. Prudential informed Tindal that the June 1986, premium draft had been returned unpaid by FAB and that Mr. Badners had died outside the 31-day grace period. Prudential therefore paid the policy as extended term insurance, under the automatic nonforfeiture provision. Under this provision, the insurance amount is the face amount of insurance, plus paid-up additional insurance provided by dividends (approximately $8000).
As noted above, Tindal sued Prudential, alleging breach of contract, and the jury found in her favor. The court overruled *Page 1317 
Prudential's motion for a new trial, and Prudential appeals.
" 'The function of the jury, which is authorized to draw all reasonable inferences from the evidence, is to resolve controverted factual inferences.' " Thorne v. C S SalesGroup, 577 So.2d 1264, 1267 (Ala. 1991) (quoting George v.Nevett, 462 So.2d 728 (Ala. 1984)). The jury's verdict is presumed to be correct, and that presumption is strengthened by the trial court's denial of the motion for a new trial. Thorne, supra. Further, this Court must review the evidence in a light most favorable to the prevailing party. Standard Plan, Inc. v.Tucker, 582 So.2d 1024 (Ala. 1991). Applying that standard of review, we conclude that there was sufficient evidence from which the jury could reasonably find that there had been a forfeiture of the waiver provision, or that there had been some alteration by practice or circumstance on which Mr. Badners had relied, or that Prudential had waived its right to forfeit the policy.
We also conclude that the trial court did not abuse its discretion in admitting into evidence certain testimony regarding the conversation between Prudential's agent and Donna Badners. "The determination of the relevancy of the evidence rests largely in the discretion of the court and its ruling will not be reversed on appeal unless it is plain that error was committed." Harper v. Baptist Medical Center-Princeton,341 So.2d 133, 135 (Ala. 1976).
As concerns Tindal's cross-appeal, we also find no merit. She argues that the trial court erred in refusing to allow her to amend her complaint to allege counts of negligence and wantonness against Prudential and FAB in order to seek additional damages. Specifically, Tindal argues that this Court should examine Prudential's entire procedure here to "determine whether or not the company had breached its duty of good faith and fair dealing with [Tindal] to assure that the benefits were paid."
Here, Tindal originally alleged breach of contract, fraud, and bad faith. The trial court dismissed the fraud and bad faith claims, and this Court affirmed the dismissal. SeeBadners, supra. Therefore, damages were limited to those recoverable on the breach of contract claim. On remand, in an effort to recover greater damages than those available under the breach of contract claim, Tindal sought to amend her complaint to allege negligence and wantonness. The trial court, however, dismissed her amendment.
Generally, amendments are to be liberally allowed. However, the trial court is given discretion in the exercise of that liberality. Rule 15(a), A.R.Civ.P.; Covington v. Exxon Co.,U.S.A, 551 So.2d 935 (Ala. 1989). Here, it appears that Tindal advanced a new theory on the basis of the same facts that had been offered in support of the bad faith claim, which had been rejected. A plaintiff may not "resurrect a dead claim by renaming it as a new cause of action based upon the exact same evidence as that relied upon for the original claim."Covington, at 940. The trial court correctly denied Tindal's amendment.
 II. (FAB v. DONNA BADNERS)
Mrs. Donna Badners (the widow of Mr. Badners) sued FAB, claiming that FAB had wrongfully dishonored the draft sent by Prudential. The jury returned a verdict in favor of Mrs. Badners and against FAB and awarded damages in the amount of $12,185.
FAB appeals, basically contending that the jury verdict in favor of Mrs. Badners was against the great weight of the evidence and is due to be reversed. First, it contends that there was no wrongful dishonor; second, it contends that the draft authorization contained an exculpatory clause releasing the bank from liability for wrongful dishonor; and, third, it contends that the damages claimed by Mrs. Badners were not proximately caused by any wrongful dishonor.
In 1973 Thomas Badners signed an agreement authorizing Prudential to draw drafts on the Badnerses' checking account *Page 1318 
at FAB. That authorization specifically referred to account number 21-076-50 as being the account that would be drafted. That arrangement continued, and drafts were drawn monthly on that account, from 1973 until March 14, 1984, when the account was closed. On and after that date, the drafts were charged against a new account that Mr. Badners had opened following his divorce from Carole Tindal. However, Prudential was never notified of any change in the accounts. After March 1984, because the drafts were on a closed account, they were directed to Dorothy Bruhn, an assistant vice-president at FAB. She manually changed the account number against which the drafts were drawn. Ms. Bruhn told Mr. Badners what she was doing.
In June 1986, after having manually drafted the new account for over 25 months, FAB did not pay the Prudential draft, but, rather, dishonored it. Ms. Bruhn testified that she thought the draft should have been paid and that she could not explain why it was not. It is undisputed that Mr. Badners had sufficient funds in his account to pay the draft.
An action for wrongful dishonor is authorized by § 7-4-402, Ala. Code 1975. Generally speaking, a wrongful dishonor must arise out of some agreement with the bank. See, generally,Annot. 88 A.L.R.4th 568 (1991). Normally, that agreement would be found on the signature card, which usually incorporates or includes the terms of the deposit agreement, or in some other agreement with the bank, e.g., a draft authorization. Here, the draft authorization lists the number of a closed account, but one of FAB's assistant vice-presidents undertook to manually change the monthly draft to an open account for over 25 consecutive months, all of this with the knowledge and approval of Mr. Badners.
Under these circumstances, we hold that an implied-in-fact agreement did exist between FAB and Mr. Badners by which FAB was to continue paying the Prudential drafts out of his new account.
 " 'An implied contract arises where there are circumstances which, according to the ordinary course of dealing and common understanding, show a mutual intent to contract. Such a contract must contain all the elements of an express contract, which rests on consent, and is to every intent and purpose an agreement between the parties, and it cannot be found to exist unless a contract status is shown.' "
Radiology Associates, P.A. v. St. Clair Timber Co.,563 So.2d 1020, 1021 (Ala. 1990) (quoting Broyles v. Brown EngineeringCo., 275 Ala. 35, 38, 151 So.2d 767, 770 (1963)). "An implied-in-fact contract may be found from circumstances showing that a mutual agreement had been reached." RadiologyAssociates, at 1021. This principle of law applies with equal force to banking agreements. (See Boyett v. Oakes, 518 So.2d 37
(Ala. 1987), where a jury verdict in favor of a customer was affirmed where there was testimony that the bank officer orally agreed to honor an overdraft and that the bank then failed to do so.)
We also find no merit in FAB's argument that an exculpatory clause in the draft authorization releases it from any liability. Section 7-4-103(1), Ala. Code 1975, prohibits clauses that seek to exculpate a bank from responsibility for its own failure to exercise ordinary care.
Finally, FAB contends that the dishonor of the Prudential premium draft did not proximately cause Mrs. Badners to suffer a monetary loss. We disagree.
The wrongful dishonor of the Prudential draft by FAB caused the forfeiture of Mr. Badners's life insurance policy, which he was obligated to keep in force under the terms of the divorce judgment. As a result, Tindal sued Mrs. Badners, both individually and as executrix of Mr. Badners's estate. In connection with that action, Tindal recorded a lis pendens notice against certain real property owned by Mrs. Badners, to secure her claim against Mr. Badners's estate. That action was ultimately resolved in favor of Mrs. Badners, but not before the existence of the lis pendens had *Page 1319 
resulted in the cancellation of a contract to sell certain real property.
The jury obviously concluded that the loss of the first sale of the Badners property was proximately caused by FAB's wrongful dishonor and that the appropriate damages were the difference between the sales price as originally contracted and the price for which the property was ultimately sold.
The jury's verdict is presumed to be correct, and that presumption is strengthened by the trial court's denial of the motion for a new trial. Thorne, supra. Reviewing the evidence in a light most favorable to the prevailing party, we find sufficient evidence to support the jury verdict.
 III. (FAB v. PRUDENTIAL)
Prudential filed a cross-claim against FAB, seeking "full and complete protection, indemnification and right to be held harmless by [FAB]." The thrust of its claim is that FAB breached its duty to honor the preauthorized draft written by Prudential against a nonexistent account. Therefore, it alleged that if Prudential was required to pay the proceeds of the policy to Tindal (and the jury found it was), then in equity and good conscience FAB should be required to make Prudential whole. The trial court agreed and granted Prudential's post-trial motion for summary judgment and denied that of FAB. The effect of the court's order was to indemnify Prudential.
In Alabama, a joint wrongdoer may claim indemnity when he has not been guilty of any fault, except technically or constructively, or where both parties are at fault but the fault of the party from whom indemnity is claimed was the efficient cause of the injury. See Crigler v. Salac,438 So.2d 1375 (Ala. 1983).
 "The theory of indemnity holds the defendant liable for the whole damage (joint tortfeasors in pari delicto) flowing from the contract. . . . [I]ndemnity seeks to transfer the entire loss of one tortfeasor to another who, in equity and justice should bear it."
Sherman Concrete Pipe Machinery, Inc. v. Gadsden Concrete Metal Pipe Co., 335 So.2d 125, 126 (Ala. 1976).
Here, the full amount of the policy (the extended term rider) was not paid because an employee of FAB did not change the account number on Prudential's preauthorized draft (for June 1986), as it had done monthly for over two years, and pay the draft out of an active account. The trial court, sitting without a jury, determined that in equity and fairness FAB should bear the liability for the damages.
Where a trial court has received ore tenus evidence, its judgment, based upon that evidence, is presumed correct and will be reversed only if the judgment is found to be plainly and palpably wrong. Knox Kershaw, Inc. v. Kershaw,552 So.2d 126 (Ala. 1989).
We hold that FAB, through its actions and custom for over two years, created a duty to Prudential to exercise ordinary care to pay the preauthorized drafts presented by Prudential against Mr. Badners's account in a reasonably prudent manner. We find no error in the trial court's entry of the summary judgment in favor of Prudential.
Likewise, we conclude that the trial court correctly denied FAB's summary judgment motion for indemnity against Prudential. The evidence is undisputed that Prudential followed the same course of conduct that it had followed for over 25 months after the closing of the account against which it was authorized to issue preauthorized drafts. The evidence was undisputed that Prudential's draft in June 1986 was against the closed account. FAB admitted that the check should have been paid and that if Ms. Bruhn, an assistant vice president, had known about the draft in June, it would have been paid. She had no excuse or explanation for FAB's failure to pay the check. Mr. Badners died before the breakdown in the system was corrected. The trial court found that in equity and good conscious FAB should bear the responsibility for its conduct and should indemnify *Page 1320 
Prudential from the damages awarded by the jury.
The judgment in this case is due to be affirmed.
AFFIRMED.
HORNSBY, C.J., and ALMON, ADAMS and STEAGALL, JJ., concur.
[1] This amount was stipulated between the parties.
[2] After his divorce in 1984, Thomas Badners married Donna Badners.