George Paul Decker and Max Davidson sued the Marshall-DeKalb Electric Cooperative, alleging breach of contract and claiming damages for lost profits and mental anguish they contended were the proximate result of the alleged breach. The trial court entered a judgment on a jury verdict for Marshall-DeKalb, and this appeal followed. We affirm.
Pursuant to a "Power Contract," the Tennessee Valley Authority ("TVA") supplies Marshall-DeKalb with electricity for its customers. Decker and Davidson own mobile home parks and are customers of Marshall-DeKalb. In 1982, Marshall-DeKalb contacted its mobile home park customers in writing, to inform them of a change in Marshall-DeKalb's procedure for supplying and billing for electrical service to mobile home parks.
In an earlier action by Davidson against Marshall-DeKalb, Davidson challenged the new billing procedure for mobile home parks (the 1982 procedure change in issue in the instant appeal). In that earlier action, the trial court entered a judgment for Marshall-DeKalb. We quote pertinent portions from this Court's opinion in the appeal in that earlier case:
 "Prior to October 27, 1982, each mobile home resident in the Davidsons' park applied *Page 928 
for an electric meter and service in his own name and was billed monthly in his own name for that service. On October 27, 1982, Marshall-DeKalb mailed a letter to [Davidson] setting out changes in the procedures for billing its customers in mobile home parks. The new procedures required that all electric service to a mobile home park be in the name of the park owner and be billed to him. Park owners were given two choices: [Plan A:] a single meter for the [mobile home park], with all equipment beyond the meter to be paid for by the park owner; or [Plan B:] individual meters at the lots, installed and billed in the name of the park owner, with all wiring in the park installed and owned by the park owner. Marshall-DeKalb explained the procedures under [Plan B], assuming the park owner would choose that plan.
". . . .
 "[Davidson] sued for a declaration that the proposed changes in billing practices would violate, inter alia, the terms of the TVA/Marshall-DeKalb contract; for an injunction prohibiting Marshall-DeKalb from changing the manner of providing and billing for electric power; and for damages.
 "The contract between Marshall-DeKalb and TVA includes the following provisions:
 " 'Purpose of Contract. It is hereby recognized and declared that, pursuant to the obligations imposed by the TVA Act, [Marshall-DeKalb's] operation of an electric system and TVA's wholesale service thereto are for the benefit of the consumers of electricity.
" '. . . .
 " 'Submetering. [Marshall-DeKalb] shall not sell electricity for submetering or resale.'
 "[Davidson contends] that [Plan A] would constitute sale for submetering and [Plan B] would constitute sale for resale. Marshall-DeKalb responds by saying that [Davidson has] no standing to bring the action because [he is] not [an] intended third party beneficiar[y] of the TVA/Marshall-DeKalb contract. The trial court so held."
Davidson v. Marshall-DeKalb Electric Cooperative,495 So.2d 1058, 1059-60 (Ala. 1986) ("Davidson I") (emphasis in original).
This Court reversed the trial court's judgment inDavidson I, holding that Davidson did, indeed, have standing to challenge Marshall-DeKalb's change in billing procedures.
 "It is inconsistent for Marshall-DeKalb to sell electricity to its members and then state that its members are not the ultimate consumers of its electricity. By making [Davidson] financially responsible for the electricity, Marshall-DeKalb precludes itself from arguing that [Davidson is] not [an] intended third-party beneficiar[y] of its contract with the TVA, from which [Marshall-DeKalb] obtains electricity.
". . . .
 "Marshall-DeKalb also argues that the real purpose of the submetering restriction is to protect the TVA from unexpectedly high demands if cooperatives were allowed to resell large quantities of relatively inexpensive TVA electricity to other utilities, and that the restriction has no application to a case like this one. This argument to the merits should be addressed to the trial court after a fuller development of the case. For purposes of [Davidson's] standing, we see a sufficient likelihood that the provision could also be construed to protect consumers from the kind of procedures that Marshall-DeKalb is attempting to impose upon mobile home park owners."
Id. at 1060-61.
Following the Court's decision in Davidson I, Marshall-DeKalb added another option for supplying electricity to mobile home parks. Marshall-DeKalb's manager, Tom Wheeler, contacted mobile home park owners via the following memorandum, dated September 26, 1986:
 "Effective immediately an alternate plan for providing electric service to tenants in mobile home parks is established. This Plan will be known as Plan C (in addition to Plan A and Plan B) and will provide for the Cooperative installing its meter in the park owner's socket and listing the account in the tenant's name. The wiring within the park must conform to the requirements *Page 929 
of the Cooperative in order for service to be given under this plan.
 "To obtain service under this plan, the tenant must make application for the service and put up five (5) dollars for a membership, fifty (50) dollars for a deposit, and ten (10) dollars for a connection fee. The amount of the deposit required and the connection fee are subject to change from time to time.
 "Monthly bills will then be rendered to the tenant and will be due and payable under the existing rules of the Cooperative."
In their complaint in this second case, filed in August 1988, Decker and Davidson stated that they are intended third-party beneficiaries of the TVA/Marshall-DeKalb contract, which provides 1) that the electricity supplied under that contract is for the benefit of the consumers, and 2) that Marshall-DeKalb is prohibited from selling electricity for submetering or resale.
Decker and Davidson specifically alleged that Marshall-DeKalb violated its contract with TVA by refusing to establish electric service in the names of Decker's and Davidson's mobile home park tenants, requiring instead that the service be established in the name of the owner of the mobile home park and that the owner be responsible for seeing that the bill for the electric service was paid. Decker and Davidson's claims and their supporting evidence concentrated on Marshall-DeKalb's original two options, Plan A and Plan B; then contended that Plan C was not a viable option because, by its own terms, it was susceptible to change.
The trial court denied Davidson and Decker's motions for a directed verdict on the issue of Marshall-DeKalb's liability for breach of contract. It also denied Marshall-DeKalb's motion for a directed verdict, based on a sufficiency-of-the-evidence ground.
In denying Marshall-DeKalb's motion for a directed verdict, the trial judge implicitly accepted the mobile home park owners' contention that the option of Plan C did not, as a matter of law, entitle Marshall-DeKalb to a directed verdict. Thus, this issue, along with the meaning and application of the TVA/Marshall-DeKalb contract, as it related to Plans A and B, was submitted, with appropriate instructions, to the jury. Because this ruling was not adverse to Decker and Davidson, it is not reviewable on this appeal.
The jury returned a verdict in favor of Marshall-DeKalb and against Decker and Davidson, and the trial court entered a judgment thereon. Decker and Davidson separately moved for a judgment notwithstanding the verdict or, alternatively, for a new trial, and also separately moved for the trial court to alter, amend, or vacate the judgment. Those post-judgment motions were denied, and Decker and Davidson appealed.
When reviewing a judgment based on a jury verdict, this Court applies a narrow standard of review:
 "Upon review of a jury verdict, [if it is supported by the evidence,] we presume that the verdict was correct; we review the tendencies of the evidence most favorably to the prevailing party; and we indulge such reasonable inferences as the jury was free to draw from the evidence. We will not overturn a jury verdict unless the evidence against the verdict is so much more credible and convincing to the mind than the evidence supporting the verdict that it clearly indicates that the jury's verdict was wrong and unjust."
Campbell v. Burns, 512 So.2d 1341, 1343 (Ala. 1987); Wal-MartStores, Inc. v. McClinton, 631 So.2d 232, 233-34 (Ala. 1993).
Strengthening the presumption of the correctness of the jury's verdict here is the trial court's denial of the post-judgment motions for a JNOV or a new trial. First AlabamaBank v. Prudential Life Ins. Co., 619 So.2d 1313, 1317
(Ala. 1993). Our review of the record convinces us that the evidence was not so decidedly against the verdict as to clearly indicate that it was wrong and unjust.
Decker and Davidson argue that the trial court committed reversible error when it failed to direct a verdict in their favor and, instead, held that the TVA/Marshall-DeKalb contract provisions in issue here were ambiguous; when it allowed Marshall-DeKalb to present evidence as to the meaning of the ambiguous provisions; and when it allowed *Page 930 
the jury to consider this evidence in interpreting the contract.
Specifically, according to Decker and Davidson, the terms "submetering," "resale," and "shall not directly or indirectly sell, sublet, assign, or otherwise dispose of the electric service or any part thereof," expressly set out in the contract, are clear and unambiguous. Therefore, say Decker and Davidson, there was no need to allow Marshall-DeKalb's witnesses to testify regarding the "custom and usage" assigned to those terms by the electric power industry or regarding the intent of TVA and Marshall-DeKalb in including those terms in the contract.
 "The question of whether a particular instrument is ambiguous is a question of law for the trial court. . . .
 "If the language of an instrument is ambiguous in any respect, the surrounding circumstances and the construction placed on the language by the parties may be taken into consideration in determining the meaning of the instrument. Furthermore, the intent of the parties may be ascertained by parol evidence."
Fouts v. Beall, 518 So.2d 1236, 1239 (Ala. 1987) (citations omitted).
 "[O]nce the court determines that an instrument is ambiguous or uncertain in any respect, it becomes a question for the fact- finder to determine the true meaning of the contract. Furthermore, surrounding circumstances, including the construction placed on the language by the parties, is to be taken into consideration in order to ascertain and carry out the intention of the parties."
Rivers v. Oakwood College, 442 So.2d 74, 76 (Ala. 1983).
We agree with the trial court's ruling that the contract here in issue is ambiguous as it relates to the provisions prohibiting the submetering and resale of the electric power supplied to Marshall-DeKalb customers. Decker and Davidson themselves point out that the terms "submetering" and "resale" are not defined by the contract or by any other document relating to the contract. However, contrary to Decker and Davidson's assertions that the absence of defining language renders the contract clear and unambiguous, it is theabsence of definitions, under these circumstances, that provides the ambiguity that requires the factfinder to determine the true meaning of the contract.
The record, particularly that portion presenting the testimony at trial, convinces us that there was substantial evidence from which the factfinder — here, the jury — could infer the intent of the parties to the TVA/Marshall-DeKalb Power Contract and thus determine the true meaning of the contract. Witnesses representing both parties to the contract (TVA and Marshall-DeKalb) consistently testified that the prohibitions on submetering and reselling electric power were placed in the contract to prevent a utility such as Marshall-DeKalb from reselling electricity to another utility, or to any entity for profit, and that the policies adopted by Marshall-DeKalb for providing electric service to mobile home parks did not violate any contractual prohibitions against submetering or reselling electric power.
Rate analyst James L. Nicholson, a TVA employee for 30 years, stated in his affidavit that his job required him to "study and review . . . operations of the 160 TVA power distributors in connection with the administration of TVA's wholesale power contract with the distributors." Nicholson testified that the intent behind the submetering prohibition was to prevent "the purchase of electricity from TVA by a power distributor such as Marshall-DeKalb for resale to a retail customer who resells it again to someone else." Nicholson also testified that the submetering procedures for mobile home parks were not unusual, were permissible, and did not violate the distributor's contract with TVA.
The deposition testimony of Thomas Wheeler, former general manager of Marshall-DeKalb, was read into the record at trial. Wheeler, who had been employed by Marshall-DeKalb for over 30 years, stated that TVA had assured Marshall-DeKalb that the prohibition of "submetering" in no way prevented Marshall-DeKalb's method for supplying and billing for electric service to mobile home parks. Wheeler testified that the reason for the submetering provision in *Page 931 
the TVA contract was to prevent Marshall-DeKalb from selling electrical power to another utility.
James Wallace Stewart, Marshall-DeKalb's current general manager, testified that the TVA contract provisions disallowing submetering and the resale of electricity were included to prevent distributors such as Marshall-DeKalb from buying electricity from TVA and reselling it, "for economic gain," to another electric distributor "who is in business exclusively for the resale of electricity."
Darrell Wayne Smith, TVA district engineer, testified that part of his daily duties was the interpretation and application of the power contract between TVA and its distributors. Smith stated that certain words and terms included in the contract, including "submetering" and "resale," have developed definitions unique to the power industry. According to Smith, submetering and reselling are prohibited by the contract with the "intent and design" to keep distributors such as Marshall-DeKalb from reselling electric power for a profit.
Smith testified that the mobile home park owners' practice of installing meters at individual mobile home sites within the park and the further practice of charging a 5% administrative fee for reading the individual meters and collecting and paying their tenants' bills are not considered by TVA as theprohibited submetering or resale of electric power. Specifically, stated Smith, none of Marshall-DeKalb's service and billing options for mobile home parks (Plans A, B, and C) violates the contract prohibition against a customer's directly or indirectly reselling electric power.
It is abundantly clear that the jury's verdict was supported by substantial evidence and that the trial court correctly denied Decker's and Davidson's post-judgment motions for a JNOV or a new trial. The judgment is affirmed.
This opinion was prepared by retired Justice RICHARD L. JONES, sitting as a Justice of this Court pursuant to §12-18-10(e), Ala. Code 1975.
AFFIRMED.
HORNSBY, C.J., and MADDOX, ALMON, SHORES, HOUSTON, KENNEDY, INGRAM, COOK and BUTTS, JJ., concur.