MOORE, Judge.
MAT Systems, Inc., d/b/a Corporate Design Systems (“MAT”) appeals from a judgment entered on a jury’s verdict *373 awarding MAT $880 in damages against Atchison Properties, Inc. (“Atchison”). MAT asserts that the trial court erred in excluding from the jury’s consideration its request for compensatory damages based upon the replacement-cost of damaged products, that the amount of damages awarded to compensate MAT for its cleanup and storage expenses was insufficient, and that the trial court erred in admitting into evidence certain of Atchison’s exhibits. Atchison cross-appeals, asserting that the trial court erred in denying its motion for a judgment as a matter of law (“JML”) as to all claims asserted against it. We affirm.

Background

In 1991, Atchison purchased property located at 1100 Dauphin Street in Mobile. Atchison, through its principal, Tony At-chison (“Tony”), acted as a general contractor and hired subcontractors to renovate the property. In connection with those renovations, Atchison hired a subcontractor to remove an old sprinkler system from the property. In preparing to have the sprinkler system removed, Tony contacted the Board of Water and Sewer Commissioners of the City of Mobile d/b/a Mobile Area Water and Sewer (“MAWSS”) and requested that water service to the sprinkler system be discontinued. MAWSS responded to that request, and, according to Tony, he observed an employee of MAWSS access an underground valve located in the City’s right-of-way and “turn off’ the water service to the sprinkler system.
Believing the water supply to have been permanently terminated, Atchison’s subcontractor removed most of the pipes to the old sprinkler system. Certain of the pipes, however, were left in the building. At least one of those pipes, six inches in diameter and visible to all who viewed the property, remained connected to the City’s water supply, although the water supply had been turned off. That pipe was not permanently capped or equipped with a shut-off valve on the premises to prevent the flow of water into the pipe from the City’s water line because, Tony stated, he believed that MAWSS had permanently terminated the water supply to the sprinkler system.
Atchison’s renovations were completed and it began leasing the renovated property in the mid-1990s. In 1998, MAT became interested in leasing the renovated property. According to Tony McCain, one of MAT’s principals, MAT was engaged in the business of selling “custom-manufactured” commercial office furniture, cubicles, architectural walls, and flooring. After inspecting the renovated property and having Atchison perform additional work on the renovated property to suit MAT’s needs and design plans, MAT and Atchison entered into a commercial lease of the property (hereinafter referred to as “the leased premises”).[1] Even after Atchison had performed MAT’s requested changes to the leased premises, the remaining six-inch pipe from the sprinkler system remained visible in the warehouse near the top of a warehouse wall. MAT then began using the leased premises and continued to do so without problem until May 2005.
On May 10, 2005, MAWSS undertook to replace an old fire hydrant in the vicinity of the leased premises. To replace the hydrant, MAWSS’s employees were required to turn off the water servicing the hydrant. MAWSS replaced the hydrant and then restored the water service. In *374 restoring the water service to the hydrant, the MAWSS employee also returned the valve controlling water service to the leased premises to the “on” position although that valve had been in the “off’ position when MAWSS began working in the area. As a result, water service to the old sprinkler system was restored and water began flowing from the City’s water supply to those pipes remaining in the leased premises. Water entered the leased premises through the pipe on the wall of MAT’s warehouse, where MAT was storing products that MAT had previously sold to its customers and that its customers were not using at that time.
MAWSS’s employees immediately noticed water flowing from under the warehouse door and returned the valve to the off position. MAT was notified of the situation within minutes of the water intrusion. According to MAT’s employees and Tony, water again entered the warehouse through that same pipe several days later.
After approximately seven weeks,[2] Southern Commercial Installations, Inc. (“SCI”), acting on behalf of MAT, emptied the contents of the warehouse, disposing of certain products and storing other products for MAT until January 2007. Although SCI was owned and operated by Wayne Maurin, a full-time employee of MAT, MAT claimed that it had incurred significant costs in emptying the warehouse, cleaning the warehouse, and storing the damaged products off-site. MAT also claimed that, as the bailee of the products in the warehouse, it was liable to its customers for the damaged products and, thus, entitled to recover compensatory damages based upon the cost to replace those damaged products.
On June 1, 2006, MAT sued Atchison asserting claims of breach of the lease agreement, negligence, and trespass on the case.[3] MAT’s claims against Atchison were tried before a jury beginning on August 31, 2009. At the close of all the evidence, Atchison moved for a JML in its favor as to all claims or, alternatively, as to MAT’s request for recovery of replacement-cost damages. The trial court denied Atchison’s motion for a JML as to all claims, but it granted that motion as to MAT’s request for replacement-cost damages. The trial court submitted MAT’s breach-of-contract, negligence, and trespass claims to the jury; the trial court instructed the jury that, if it found in favor of MAT on the negligence or trespass claims, it could award MAT damages only for those costs reasonably incurred by MAT to empty and clean the warehouse and for storing the damaged products. On September 3, 2009, the jury returned a verdict in favor of MAT on the negligence and trespass claims; the jury awarded MAT $880 in damages. The jury found in favor of Atchison on the breach-of-contract claim.
On September 17, 2009, MAT moved, pursuant to Rule 59, Ala. R. Civ. P., for a new trial or, alternatively, to alter or amend the judgment. Although Atchison responded to MAT’s postjudgment motion, Atchison did not seek postjudgment relief *375 from the denial of its motion for a JML. On October 9, 2009, MAT filed its notice of appeal with the Alabama Supreme Court; however, that appeal was held in abeyance pending the disposition of MAT’s post-judgment motion. See Rule 4(a)(5), Ala. R.App. P. On October 23, 2009, the trial court denied MAT’s pending postjudgment motion and MAT’s appeal ripened. The Alabama Supreme Court transferred MAT’s appeal to this court, pursuant to Ala.Code 1975, § 12-2-7(6). Atchison then filed its cross-appeal.
On appeal, MAT challenges the propriety of the JML entered in favor of Atchi-son on MAT’s request for replacement-cost damages; MAT argues that, as a result of that JML, MAT’s request for damages based upon the replacement costs of the damaged products was improperly excluded from the jury’s consideration. MAT also asserts that it was entitled to a new trial because, it argues, the jury awarded it insufficient damages to compensate it for the costs it incurred to clean the warehouse and to store the damaged products. Finally, MAT asserts that the trial court erred in admitting into evidence certain of Atchison’s exhibits. In its cross-appeal, Atchison asserts that the trial court erred in denying its motion for a JML as to all the claims asserted against it.

Atchison’s Cross-Appeal

We first address Atchison’s cross-appeal, because the resolution of the cross-appeal is potentially dispositive of MAT’s appeal. The trial court allowed MAT’s claims for breach of the lease agreement, negligence, and trespass on the case to go to the jury. In its preverdict motion for a JML, and again on appeal, Atchison argues that it was absolved of all liability by virtue of the exculpatory language included in the commercial lease executed by MAT and Atchison and that, as a result, none of MAT’s claims should have gone to the jury.[4] In response to Atchison’s motion for a JML, MAT argued that Atchison was not entitled to the benefit of the exculpatory language because, under Alabama law, a lessor may not rely on exculpatory language in a lease when, at the time the landlord-tenant relationship arose, the lessor knew or had reason to know of the risks associated with a latent defect and failed to disclose those risks to the lessee.
We agree with MAT that, under applicable Alabama law, if substantial evidence was presented on the question whether Atchison, as the lessor, knew or had reason to know of the latent defect at issue and failed to disclose that defect to MAT, as the lessee, at the time the lease was executed, Atchison was not entitled to the protections afforded it by the exculpatory language in the lease. See, e.g., Taylor v. Leedy & Co., 412 So.2d 763, 764 (Ala.1982) (“Exculpatory clauses ... exonerate the landlord from liability for his own future negligence, ... not for concealment of a known latent defect which subsequently causes injury.... [A] latent defect is an exception to the coverage of an exculpatory clause.”).
Thus, in ruling on Atchison’s motion for a JML, i.e., in determining whether Atchi-son was entitled to the protection of the exculpatory language contained in the lease, the trial court first had to deter *376 mine whether sufficient evidence had been presented to create a jury issue on the question whether Atchison knew or had reason to know of the latent defects in the premises and whether Atchison concealed those defects from MAT. Because the trial court denied Atchison’s motion for a JML as to all claims and instructed the jury to determine whether the above-stated rule prevented Atchison’s reliance on the exculpatory language, the trial court clearly decided that sufficient evidence on those questions had been presented. Atchison seeks appellate review of that determination.
In Cook’s Pest Control, Inc. v. Rebar, 28 So.3d 716 (Ala.2009), our supreme court stated:
“ ‘One who, on appellate review, seeks, on the ground of insufficiency of the evidence, the reversal of an adverse judgment and the entry of a judgment in his favor, must meet a two-pronged test: 1) He must ask for a directed verdict [now renamed a JML] at the close of all the evidence, specifying “insufficiency of the evidence” (lack of proof) as a ground; and 2) he must renew this motion by way of a timely filed post-judgment motion for J.N.O.V. [now renamed a renewed motion for a JML], again specifying the same insufficiency-of-the-evidence ground. See Rule 50, [Ala.] R. Civ. P., and Committee Comments; Bains v. Jameson, 507 So.2d 504, 507 (Ala.1987); and Ritch v. Waldrop, 428 So.2d 1 (Ala.1982).’ ”
28 So.3d at 722 (quoting King Mines Resort, Inc. v. Malachi Mining & Minerals, Inc., 518 So.2d 714, 716 (Ala.1987)).
Atchison failed to file a renewed motion for a JML after the jury returned its verdict. The record contains no post-judgment motion filed by Atchison and no indication that, after the jury returned its verdict, Atchison ever requested that the trial court revisit its ruling on the sufficiency-of-the-evidence issue. Without the filing of a renewed motion for a JML on that issue, Atchison has failed to properly preserve for appellate review the issue whether the trial court erred in denying its motion for a JML as to all claims. We, therefore, cannot reach the merits of that issue, and, as to Atchison’s cross-appeal, the trial court’s judgment is affirmed.

MAT’s Appeal

MAT’S Challenge to Evidentiary Rulings

We address MAT’s issues out of order. MAT asserts that Atchison’s exhibits 6 and 7, which were printouts of the results of Internet searches on the issue of “used office furniture,” were admitted into evidence in violation of the Alabama Rules of Evidence. Generally, rulings on the admissibility of evidence are within the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of that discretion. Bama’s Best Party Sales, Inc. v. Tupperware, U.S., Inc., 723 So.2d 29, 32 (Ala.1998).
We need not, however, consider the merits of MAT’s evidentiary challenges because, as explained below, any error resulting from the admission into evidence of Atchison’s exhibits was harmless. At the trial, Harvey McCain, one of the principals of MAT, was questioned extensively about the information contained on those exhibits; that questioning, which was detailed and specific, occurred without objection. Atchison’s counsel then offered the exhibits into evidence, and MAT’s counsel objected, asserting various evidentiary objections. Thus, at the time MAT’s counsel lodged those objections, the jury had already heard McCain’s testimony on those issues and that testimony had already been made a part of the record. Thus, any error resulting from the trial court’s discretionary ruling to admit the exhibits into *377 evidence was harmless because the exhibits were merely cumulative and repetitive of McCain’s testimony. See, e.g., C.E.W. v. P.J.G., 14 So.3d 166 (Ala.Civ.App.2009) (although father timely objected to certain questions regarding his incarcerations, he failed to object to other questions on the same issue; thus, father’s challenge on appeal to the admission of that testimony was waived); and Gobble v. State, [Ms. CR-05-0225, Feb. 5, 2010] — So.3d -, - (Ala.Crim.App.2010) (addressing alleged error in the admission of an exhibit as being harmless because “ ‘[t]he erroneous admission of evidence that is merely cumulative is harmless error’ ”) (quoting Dawson v. State, 675 So.2d 897, 900 (Ala.Crim.App.1995)). We, therefore, find no reversible error as to this issue.

MAT’S Request for Damages Based Upon the Cost to Replace the Damaged Products

MAT next asserts that the trial court erred in excluding from the jury’s consideration MAT’s request for $227,000 in damages “predicated upon the replacement cost of the bailed property in the [warehouse] that was damaged or destroyed on May 10, 2005.” MAT asserts that a “bailee may recover damages to bailed property notwithstanding the absence of a claim for such damages by the bailor and may use replacement costs as the measure of damages where no market exists for the bailed property.” MAT also asserts that, because the property stored in the warehouse was “custom-manufactured” for its customers, that property was unique and no market for that property existed. Thus, MAT argues, as the bailee of the property, it was entitled to recover damages based upon the costs to replace the damaged products.
In support of its argument, MAT relies on Ala.Code 1975, § 6-5-263, which provides:
“In case of bailments where the possession is in the bailee, a trespass committed during the existence of the bailment will give a right of action to the bailee for the interference with his special property and a concurrent right of action to the bailor for the interference with his general property.”
In view of § 6-5-263, we agree with MAT that, unless limited by the terms of the bailment contract, a trespass to the rights of a bailee gives rise to a right of action in the bailee for interference with the bailee’s special property rights.[5] Section 6-5-263 does not, however, establish that, in every bailment, a bailee will have a property interest in the bailed property sufficient to support the recovery of damages.
Atchison challenges on appeal whether MAT’s interest in the bailed property was sufficient to entitle it to seek an award of damages for the loss of that property. Atchison asserts that MAT obtained no property rights in the bailed property, that ownership of the property in the warehouse remained with MAT’s customers, and that MAT’s employees admitted that they had no way of documenting which of the products belonged to which of MAT’s customers. MAT responds that its customers need not have asserted any claim for their damaged property as a prerequisite to MAT’s cause of action against At-chison.
We need not resolve this dispute because, even when such a right of action is found to exist in the bailee, a bailee, as any other plaintiff, must still provide a reasonable basis for the calculation of its claimed damages in order to recover.
*378 ‘“It is true that damages may be awarded only where they are reasonably certain. Damages may not be based upon speculation. Industrial Chemical & Fiberglass Corp. v. Chandler, 547 So.2d 812 (Ala.1988); see also Alabama Power Co. v. Alabama Public Service Commission, 267 Ala. 474, 103 So.2d 14 (1958).... [The plaintiff] “must produce evidence tending to show the extent of damages as a matter of just and reasonable inference.” C. Gamble, Alabama Law of Damages § 7-1 (2d ed.1988), as cited in Industrial Chemical, supra, at 820....’
“Jamison, Money, Farmer & Co. v. Standeffer, 678 So.2d 1061, 1067 (Ala.1996). See also Birmingham News Co. v. Horn, 901 So.2d 27, 65 (Ala.2004) (damages for lost profits based upon tort claim are recoverable if proved with reasonable certainty). When a plaintiff fails to demonstrate damage or injury attributable to the defendant’s breach of contract or tortious act, a judgment awarding damages should not stand. See, e.g., Hensley v. Poole, [910 So.2d 96 (Ala.2005) ], Parsons v. Aaron, [849 So.2d 932 (Ala.2002) ].”
Systrends, Inc. v. Group 8760, LLC, 959 So.2d 1052, 1075-76 (Ala.2006).
In determining the proper measure of damages when personal property has been damaged,
“Alabama adheres to the general principle that one measures damages where personal property has been damaged by calculating the difference between the reasonable market value of the property immediately before it was damaged and the reasonable market value immediately after it was damaged. E.g., Sunshine Homes v. Hogan, 408 So.2d 149, 151 (Ala.Civ.App.1981); 1 Alabama Pattern Jury Instructions — Civil, Instruction 11:23 (2d ed.1993).”[6]
Lary v. Gardener, 908 So.2d 955, 959 (Ala.Civ.App.2005).
“However, it is well settled that the foregoing general principle is not the sole applicable legal precept....
“Although not every item of personalty that is capable of being damaged as a result of another’s tortious conduct has an established market value, tortfeasor is not discharged of liability simply by the absence of such a value:
“ ‘The general rule establishing market value as a measure of value of personal property is not absolute and the courts are agreed that the absence of a market value for property injured or destroyed will not remit the owner to nominal damages only. In such a situation the courts will consider such other relevant facts and circumstances as determine the amount necessary to compensate the plaintiff. However, it is to be observed that this rule does not relieve the plaintiff of his burden of offering evidence showing that he has been damaged and the extent or amount of his loss, since the court will *379 not base an award upon mere speculation. Southern Express Co. v. Owens, 146 Ala. 412, 41 So. 752, 8 L.R.A.,N.S., 369 [1906]; Kates Transfer & Warehouse Co. v. Klassen, 6 Ala.App. 801, 59 So. 355 [1912]; Sarkesian v. Cedric Chase Photographic Laboratories, Inc., 324 Mass. 620, 87 N.E.2d 745, 12 A.L.R.2d 899, notes 906, 909 [1949].
“ ‘The plaintiff, in the absence of evidence showing market value, may prove other factors of value such as the value of the property to him. Birmingham Ry. L. & P. Co. v. Hinton, 157 Ala. 630, 47 So. 576 [1908]; Cooney v. Pullman Palace-Car Co., 121 Ala. 368, 2[5] So. 712, 53 L.R.A. 690 [1898]; Buerger v. Mabry, 15 Ala.App. 241, 73 So. 135 [1916].’
“White v. Henry, 255 Ala. 7, 10, 49 So.2d 779, 781-82 (1950). To like effect is Southern Express Co. v. Owens, 146 Ala. 412, 41 So. 752 (1906):
“ ‘Ordinarily, where property has a market value that can be shown, such value is the criterion by which actual damages for its destruction or loss may be fixed. But it may be that property destroyed or lost has no market value. In such state of the case, while it may be that no rule which will be absolutely certain to do justice between the parties can be laid down, it does not follow from this, nor is it the law, that the plaintiff must be turned out of court with nominal damages merely. Where the article or thing is so unusual in its character that market value cannot be predicated on it, its value, plaintiffs damages, must be ascertained some other rational way, and from such elements as are attainable.’
“146 Ala. at 426, 41 So. at 755-56. Accord, Restatement (Second) of Torts, §§ 911, 928 (1979); see generally W.E. Shipley, Annotation, ‘Measure of Damages for Conversion or Loss of, or Damage to, Personal Property Having No Market Value,’ 12 A.L.R.2d 902 (1950).”
Gardener, 908 So.2d at 959-60.
When no market for the property at issue exists, Alabama courts have recognized that the cost to repair or replace the property is “an evidentiary factor” that may be considered in determining the value of the property before and after the injury.[7] Garner v. Kent Excavation, Inc., 532 So.2d 1033, 1034 (Ala.Civ.App.1988) (citing McCullough v. L & N R.R., 396 So.2d 683 (Ala.1981); and Arrick v. Fanning, 35 Ala.App. 409, 47 So.2d 708 (1950)). See also J. Marsh & C. Gamble, Alabama Law of Damages § 7:3 (5th ed.2004) (recognizing that evidence of cost of repair may be a relevant consideration in establishing the difference in value of personal property before and after an injury to that property). Thus, an owner of damaged property is generally not entitled to recover the replacement cost of that property as its full measure of damages; the replacement cost is merely one factor to consider in arriving at a proper valuation of the property before and after the injury. Other factors recognized as relevant to establishing the value of the property at the time of the injury are the original purchase price of the property or the value of the materials and labor required to produce the property at issue, *380 the manner in which the property had been used, its general condition and quality, and any depreciation since its purchase or construction based upon its use, previous damage, or decay. See, e.g., The Lucille, 169 F. 719 (S.D.Ala.1909) (in action for damages to a ship where no market value for the ship before and after the injury could be established, damages were to be calculated by determining the original construction cost for the ship and then reducing that amount by the amount of the ship’s depreciation and the value of any salvageable parts). See also Laubaugh v. Pennsylvania R.R., 28 Pa.Super. 247 (1905) (determination of real and ordinary value of flood-damaged goods at the time of their injury would include consideration of original cost of the goods, the manner in which goods had been used, general condition of goods, quality of goods, and their depreciation since purchase or manufacture); and W.E. Shipley, Annotation, “Measure of Damages for Conversion or Loss of, or Damage to, Personal Property Having No Market Value,” 12 A.L.R.2d 902 (1950) (discussing cases in which various factors relevant to a calculation of damages are identified). Applying those principles, we review the evidence presented to determine whether the trial court erred in excluding from the jury’s consideration MAT’s claim for damages based upon the costs to replace the damaged products.
At trial, Harvey McCain testified that MAT exclusively sold “custom-manufactured office system components.” Testimony at trial established that the products stored in the warehouse consisted of, among other things, desks, work stations, wall panels, flooring, and floor coverings. Other testimony established that basic office equipment, such as desk chairs and task lights, was also stored in the warehouse on May 10, 2005.[8] All of those products had been previously purchased by MAT’s customers and had been used by MAT’s customers.[9]
Although MAT’s employees repeatedly testified that they knew of no market for used “custom-manufactured office components,” the evidence established that dealers of used office furniture exist in the Mobile area and throughout the United States; the evidence presented established that those dealers offer, among other things, used work stations, used cubicles, used offices chairs, and used office desks for sale. Additionally, on cross-examination, Pam Maurin, a MAT employee, admitted that the products in MAT’s warehouse certainly had value before the May 10, 2005, water intrusion but that she did not know how to value the products because she had no experience in the used-furniture industry.
Despite the “custom-manufactured” nature of the products, evidence was presented to indicate that the used products were not limited in value and usefulness to only the location for which they had been ordered. Pam Maurin explained that MAT’s customers might store previously purchased products with MAT while reconfiguring their facilities until they decided *381 whether to reuse the previously purchased products. Wayne Maurin, also a MAT employee and Pam Maurin’s husband, testified that a customer also might store previously purchased products in MAT’s warehouse while relocating its business or office to a different physical location altogether; according to Wayne Maurin, such a customer might want to reuse the previously purchased products in its new location. That testimony established that the used products, despite their purportedly “custom-manufactured” nature, were capable of productive use in a location other than the one for which they had been ordered and manufactured.
MAT’s evidence also failed to establish that its customers intended to reclaim the property stored in the warehouse. It was undisputed at trial that, even before the May 10, 2005, incident, at least some of MAT’s customers had stored products in MAT’s warehouse but had never sought the return of those products. Wayne Maurin, who was also the owner of SCI, the company responsible for installing and moving furniture for MAT, admitted that, in the past, customers had not reclaimed their stored products and MAT had simply discarded the products.
MAT’s evidence also failed to establish with any degree of certainty the identity of the owners of the products in the warehouse, the age of the products in the warehouse, the condition of the products as they were accepted for storage by MAT, i.e., before the water entered the warehouse, or whether the products had any salvage value after the May 10, 2005, water intrusion. Wayne Maurin acknowledged that neither he, nor MAT, nor SCI had any way of knowing what products were in the warehouse, which customer owned which particular item, how long the customer had owned it, or the condition of the products at the time they were originally delivered to the warehouse. Pam Maurin further admitted that the items in the warehouse could have been anywhere from one to six years old and that she had no records to establish whether a product in the warehouse had been returned to MAT because of previous damage, poor condition, or because the customer had intended to reuse it. Additionally, Jenny Smith, a MAT employee, testified that some of the products removed from the warehouse had been stored there for years, that some of the products had been damaged before the May 10, 2005, water intrusion, and that, upon the removal of each box from the warehouse in July 2005, neither she nor Pam Maurin had opened the contents of each box to determine the condition of the contents of the box.
Further, MAT offered only scant evidence indicating a value that could be assigned to its damages. Pam Maurin testified that she had determined that it would cost MAT $227,000 to replace the products that had been stored in MAT’s warehouse. In arriving at that value, Pam acknowledged that her valuation of those products had been based solely on the replacement cost of those items. Pam admitted that neither she nor anyone else affiliated with MAT had attempted to determine whether the products stored in MAT’s warehouse had had any market value either before or after the water intrusion. Additionally, although Pam testified that MAT had incurred costs to replace products belonging to one of its customers, the Veterans Administration (“the VA”), that had been damaged by the May 10, 2005, water intrusion into the warehouse, she could not specifically identify the items she claimed had been replaced for the VA.[10] MAT pro *382 duced no invoices or checks to document the costs it claimed it had actually incurred to replace those items.
Based on the foregoing, we conclude that the evidence established that the used office furniture had value on the secondary market. “Ordinarily, where property has a market value that can be shown, such value is the criterion by which actual damages for its destruction or loss may be fixed.” Southern Express Co. v. Owens, 146 Ala. 412, 426, 41 So. 752, 755 (1906). Although the evidence indicated that a market value existed and could have been determined for the damages products, the only evidence offered by MAT related to the costs to replace those products with new products. Evidence of replacement costs, standing alone, was insufficient to allow the jury to establish a reasonable and fair-market value for the products both before the damage and after the damage. See SouthTrust Bank v. Donely, 925 So.2d 934, 943 (Ala.2005) (“It is the plaintiffs burden to produce competent evidence establishing the existence of and amount of damages.”); and Johnson v. Harrison, 404 So.2d 337, 340 (Ala.1981) (“[T]he plaintiff has the burden of offering evidence tending to show to the required degree, the amount of damages allegedly suffered.”). Without competent evidence of its claimed damages, the trial court properly excluded MAT’S request for damages based solely upon the costs to replace the products that had been in the warehouse on May 10, 2005.

Denial of MAT’S New-Trial Motion

MAT next asserts that the trial court erred in denying its motion for a new trial, which, it argues, should have been granted because the jury awarded MAT insufficient damages to compensate it for the costs it incurred in cleaning the warehouse after the water intrusion and in storing the products damaged by the water intrusion. “A jury’s verdict is presumed correct and will not be disturbed unless it is plainly erroneous or manifestly unjust.” Crown Life Ins. Co. v. Smith, 657 So.2d 821, 822 (Ala.1994). “[T]hat presumption is strengthened when the trial court has denied a motion for a new trial.” South-Trust Bank v. Donely, 925 So.2d at 943 (citing First Alabama Bank of South Baldwin v. Prudential Life Ins. Co. of America, 619 So.2d 1313 (Ala.1993)). A judgment based upon a jury verdict and sustained by the denial of a postjudgment motion for a new trial will not be reversed unless it is plainly and palpably wrong. National Sec. Ins. Co. v. Donaldson, 664 So.2d 871 (Ala.1995).
In Wells v. Mohammad, 879 So.2d 1188 (Ala.Civ.App.2003), this court addressed at length the considerations applicable to our review of a trial court’s ruling on a motion for a new trial on the ground on inadequate damages:
“Jury verdicts are presumed to be correct and will be set aside on the ground of an inadequate award of damages only where the award is so inadequate as to indicate that the jury was influenced by passion, prejudice, or improper motive. Helena Chem. Co. v. Ahern, 496 So.2d 12, 14 (Ala.1986).
“ ‘Where there is a dispute regarding the damages the plaintiff incurred as a proximate result of the defendant’s *383 wrongful conduct, the determination of a damages award is exclusively within the discretion of the jury and the jury’s assessment should be afforded a strong presumption of correctness. Sizemore v. Patel, 702 So.2d 172, 174 (Ala.Civ.App.1997); Brannon v. Webster, 562 So.2d 1337, 1339 (Ala.Civ.App.1990); Nemec v. Harris, 536 So.2d 93, 94 (Ala.Civ.App.1988). Furthermore, in exercising its discretion, a jury has the exclusive right to weigh evidence, give credibility (or not) to witnesses, and draw inferences from the evidence before it. Brannon, 562 So.2d at 1339; Slaughter v. Burrell, 669 So.2d 954, 955 (Ala.Civ.App.1995).’
“Savoy v. Watson, 852 So.2d 137, 140 (Ala.Civ.App.2002).
[[Image here]]
“ ‘When reviewing a motion for new trial on the grounds of inadequate damages, the reviewing court must consider whether the verdict is so opposed to the clear and convincing weight of the evidence as to clearly fail to do substantial justice, and whether the verdict fails to give substantial compensation for substantial injuries. Orr v. Hammond, 460 So.2d 1322 (Ala.Civ.App.1984). In addition, the reviewing court must keep in mind that a jury verdict is presumed to be correct and will not be set aside for an inadequate award of damages unless the amount awarded is so inadequate as to indicate that the verdict is the result of passion, prejudice, or other improper motive. Orr v. Hammond, supra.’
“Helena Chem. Co. v. Ahern, 496 So.2d at 14.”
Wells v. Mohammad, 879 So.2d at 1193-94 (emphasis in Wells removed).
In this case, the jury was instructed that, if it found in favor of MAT, it could award damages in an amount to “fairly and reasonably compensate” MAT for its costs in cleaning the warehouse and in storing the damaged products. On the issue of MAT’S expenses, the jury heard evidence that MAT had hired SCI, a company owned and operated by Wayne Maurin, one of MAT’S three employees, to clean the warehouse and to store the products removed from the warehouse. Wayne acknowledged that the wet products had remained in MAT’s warehouse “for a while” after May 10, 2005; other evidence indicated that MAT had allowed the products to remain in the warehouse until the first week of July 2005, some seven weeks after the water intrusion had occurred. Wayne admitted that MAT could have moved the products out of the warehouse immediately had it wished to do so; Pam Maurin also acknowledged that the damage to the items in the warehouse had probably worsened because of the length of time those items remained in the warehouse after sustaining water damage.
Wayne testified that, in order to clean out the warehouse, SCI had brought in a dumpster and a truck and, for those items not disposed of immediately, SCI had moved them to its warehouse and into additional space that it had rented for that purpose. Although SCI’s total bill was more than $70,000, Wayne testified that SCI had accepted $31,116 from MAT in settlement of its bill. According to Wayne, SCI’s bill had included $10,716 representing “billable hours for men to work,” $10,800 for storage services for dates “May 2005 through January 2006”; and $9,600 for storage services for February 2006 through January 2007.
Cross-examination of MAT’S witnesses established that, although MAT acknowledged that it had not emptied its warehouse until July 2005, SCI’s bill sought storage fees for the damaged products as *384 of May 2005. Additionally, although MAT claimed that the products were a complete loss, MAT was seeking to recover costs for storing the damaged products from May 2005 until January 2007. Wayne also admitted that he had continued to receive his usual salary from MAT while he and his father had billed MAT for their services in pressure-washing the warehouse and in moving the products to SCI’s storage facility.[11] Wayne also testified that SCI was subcontracted to MAT; thus, even before the May 10, 2005, water intrusion, SCI’s warehouse was dedicated to MAT’s use. Wayne further admitted that the invoices SCI had submitted to MAT for its services all bore the date of August 2005 but that they purported to bill for services SCI had rendered after that date.
Atchison also presented its own evidence establishing that it had offered free warehouse space to MAT for the purpose of storing the damaged products. Pam Mau-rin acknowledged that Atchison had offered MAT the use of warehouse space free of charge but that MAT had declined to use that space, opting instead to hire SCI.
Based on the evidence presented at trial, we conclude that whether MAT’s claimed expenses were reasonable and necessary as a result of the May 10, 2005, water intrusion was a controverted issue and was for the jury to resolve.
“It is well settled that a jury is not required to award the plaintiff damages representing medical expenses merely because those medical expenses were incurred. Savoy v. Watson, [852 So.2d 137 (Ala.Civ.App.2002) ]; Sizemore v. Patel, 702 So.2d 172 (Ala.Civ.App.1997); Bennich v. Kroger Co., 686 So.2d 1256 (Ala.Civ.App.1996); Brannon v. Webster, 562 So.2d 1337, 1339 (Ala.Civ.App.1990). When evidence pertaining to medical expenses is admitted, the jury is free to conclude that some or all of those expenses were unnecessary, or that those expenses were not incurred as a result of the negligence of the defendant. Savoy v. Watson, supra (citing Kite v. Word, 639 So.2d 1380 (Ala.Civ.App.1994), and quoting Bennich v. Kroger Co., supra). ‘A jury may question the “reasonableness and necessity of expenses and determine whether the claimed medical expenses are proximately caused by the negligence of the defendant.” ’ Kite v. Word, 639 So.2d at 1381 (quoting Vinzant v. Hughes, 579 So.2d 681, 683 (Ala.Civ.App.1991)).
[[Image here]]
“... This court has held that ‘[c]on~ fliets and weaknesses in the plaintiffs case may also be created through cross-examination of the plaintiffs witnesses.’ Bennich v. Kroger Co., 686 So.2d at 1257 (citing Brannon v. Webster, 562 So.2d at 1338).”
Wells, 879 So.2d at 1193-94.
Based on its award of only $880 in damages, the jury obviously decided that the majority of MAT’s claimed expenses was not reasonable or necessary. As in Wells, supra, the jury in this case was not obligated to award MAT damages for its claimed expenses simply because evidence of those expenses was presented. Atchi-son challenged those expenses on cross-examination, and that cross-examination exposed certain conflicts and weaknesses in the testimony and evidence offered in support of those expenses. We cannot say that the jury’s award of damages was “ ‘so opposed to the clear and convincing weight of the evidence’ ” as to be clearly incorrect because “the damages award is one that *385 reasonable jurors could have made based on the particular record presented.” Wells, 879 So.2d at 1195 (quoting Helena Chem. Co. v. Ahern, 496 So.2d 12, 14 (Ala.1986), and Savoy v. Watson, 852 So.2d 137, 141 (Ala.Civ.App.2002)). We, therefore, affirm the trial court’s denial of MAT’s motion for a new trial.

Conclusion

Regarding Atchison’s cross-appeal, we affirm the trial court’s denial of Atchison’s motion for a JML as to all claims. Regarding MAT’s appeal, we affirm the trial court’s evidentiary rulings as to Atchison’s exhibits nos. 6 and 7, the JML entered in favor of Atchison as to MAT’s request for replacement-cost damages, and the denial of MAT’s motion for a new trial.
AFFIRMED.
PITTMAN, BRYAN, and THOMAS, JJ., concur.
THOMPSON, P.J., concurs in part and dissents in part, with writing.

. It is unclear from the record whether MAT leased the entire premises renovated by Atchi-son or only a portion of that property.

. Pam Maurin, a MAT employee, testified that she and Jenny Smith, another MAT employee, had prepared an inventory of the products as they were removed from the warehouse during the cleanup. That inventory was completed on or around July 5, 2005.

. MAT also named MAWSS as a defendant, but the trial court subsequently entered a summary judgment in favor of MAWSS. After the trial, MAT sought to have the trial court set aside that summary judgment; the trial court denied that motion, and MAT has not challenged that ruling on appeal. As a result, we need not discuss MAWSS’s role in this case except when it is required for an understanding of the issues raised on appeal.

. The exculpatory language in the lease provided:
"Lessor shall not be liable for any loss or damage caused by, or growing out of, any breakage, leakage, getting out of order by defective conditions of said elevators, heating, air conditioning or other mechanical installations and/or systems, electric wiring, pipes, closets or plumbing or any of them, nor shall Lessor be liable for any damage to any property on said premises caused by or growing out of, fire, rain, lightning, wind, high water, over-flow water, freezing or other causes."

. MAT offered no contracts to establish the terms of its bailment agreements with any of its customers, and it appears that no written contracts existed.

. The parties tried this case apparently in agreement that the measure of damages applicable to noncommercial personal property governed the resolution of the amount of damages to be awarded, although the property stored in the warehouse was undisputedly commercial furniture. See Dean v. Johnston, 281 Ala. 602, 606, 206 So.2d 610, 614 (1968) (addressing the proper measure of damages applicable to claims involving commercial ve-hides; that measure of damages indudes consideration of any necessary repairs and the reasonable value of the commercial vehicle’s use or hire during the time required to make such repairs and fit it for business use). Because the parties agree that the principles applicable to noncommercial property govern in this case, we need not consider that issue further.

. This case does not involve the typical categories of property having no established market value, such as family photographs, family mementos, family portraits, or used personal clothing. In cases in which such property is at issue, the owner of the property generally is allowed to offer testimony as to the value of the property or as to its importance to him or her.

. Pam Maurin, a MAT employee, testified that the desk chairs MAT ordered for its customers were also "custom-ordered” because they were based on their customers’ color and fabric preferences, the intended user’s weight, height, and special needs for back support, whether the chair was intended for use at a computer or a desk, and whether the user needed arms on the chair.

. MAT’s employees testified that, as a service to its customers, MAT stored in its warehouse products previously purchased from MAT; MAT provided that service to its customers free of charge.

. The only' evidence offered on this point was the inventory list prepared by Pam Mau- *382 rin on which a recurring note indicating “VA Replacement” had been placed under 73 of the products removed from the warehouse. The inventory list containing those notes was not admitted into evidence, and no objection to the omission of that exhibit was raised. Pam also acknowledged at trial that the note could have been entered inadvertently on the inventory list under many of those products and that the note did not necessarily indicate that all 73 products had been replaced for the VA.

. Wayne also testified that his mother worked for SCI and that his father, who held full-time employment elsewhere, often helped out at SCI when needed.